## WEBER v. UNITED STATES.
### No. 1212.

Circuit Court of Appeals, Tenth Circuit.
Dec. 16, 1935.

688

David H. Cannon, of Los Angeles, Cal., for appellant.

Dan B. Shields, U. S. Atty., and John S. Boyden and Scott M. Matheson, Asst. U. S. Attys., all of Salt Lake City, Utah.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

This is an appeal from a conviction for use of the mails in execution of a scheme to defraud in violation of section 215 of the Criminal Code. 18 U.S.C.A. § 338. Lester L. Rankin, Irving Weber, J. George Wright, alias Charles R. Allen, Louis J. Bowers, Mervin Rosenthal, Robert Hendison, Ed Prival, and William Fisher were indicted in ten counts. The scheme alleged was that defendants, operating under the name of Lester Rankin & Co., would represent to investors by means of letters, circulars, and telephone and other conversations that Lester Rankin & Co. was a bona fide brokerage concern in Salt Lake City, Utah; that it was established in 1920; that it was able to execute and was executing for investors orders for the purchase and sale of stocks, bonds, and securities on the stock exchange at New York, Chicago, San Francisco, and elsewhere; that it would exercise care and watchfulness over stocks, bonds, and securities purchased through it; that it was an expert and would advise investors when to buy, sell, switch, and convert their stocks in such manner that they would realize the largest profits; that it possessed information with respect to pooling stocks and that when pooling operations began stocks would increase greatly in value; that it maintained a statistical department of the highest value through which investors would be advised when and what stocks to buy or sell; that by means of a small down payment to the company and the execution of a written contract called a convenient budget purchase plan agreement, investors could purchase various stocks being traded on the stock exchange, namely, Canada Dry Ginger Ale, Inc., United Corporation, General Motors Corporation, American Radiator & Standard Sanitary Corporation, Radio Corporation of America, Brillo Manufacturing Company, and others; that stocks purchased in that manner would greatly increase in value and could be sold at large profits before further payments on the purchase price would be due; that the payments provided in the plan need not be made when due; that the company would not forfeit any rights of investors on account of failure to make them; that instead it would

protect investors from forfeiture under the agreement; that after investors were thus induced to remit money and deliver property to the company as part payment for such stocks, and if the stocks increased in value and profits accrued, defendants would then represent that investors should sell their stocks, execute new agreements for the purchase of larger quantities of other stocks using the original investments and profits as the down payment; that such investors would thus become overloaded and it would become impossible for them to make their monthly payments; and that upon default defendants would represent that the company had sold the stocks and closed out the accounts. It was further alleged that all of such statements were false; that the company was not a bona fide brokerage concern established in 1920; that it was not able to execute orders for the purchase and sale of stocks, bonds, and securities on any stock exchange except that in Salt Lake City; that it was recklessly managed without capital and resources sufficient to finance its alleged operations; that it was not bona fide engaged in the sale of stocks, bonds and securities on installment payments; that it did not intend to make bona fide sales and deliveries of stocks so purchased by investors, but only a pretense thereto; that stocks, bonds, and securities purchased under the convenient budget plan could not be sold at a profit before deferred payments on the purchase price would be due; that the company would be short large amounts of stocks due to investors; and that in fraudulently closing out the accounts, they would convert to their own use and benefit the sums which the investors had paid. Each count appropriately set forth that in furtherance of the scheme and artifice a described letter was sent through the mails.

The case was dismissed during the trial as to Rosenthal, Hendison, Prival, and Fisher. Rankin, Weber, Wright, and Bowers were convicted on all counts. All appealed, but Rankin, Wright, and Bowers subsequently dismissed their appeals. Weber alone is now before court.

The sufficiency of the indictment was challenged by demurrer, the basis of the attack being that it failed to state facts which constitute an offense; that it was ambiguous, unintelligible, and uncertain because it failed to allege the manner or particular in which the company was not a bona fide stock brokerage concern; failed to allege the reason it was unable to execute orders for the purchase and sale of stocks, bonds, and securities; failed to allege the manner in which it was recklessly managed; failed to allege what capital and resources were necessary or sufficient for its operations; failed to state the particulars in which it was unsafe and unable to exercise care and watchfulness over investments; failed to allege in what particulars the statistical department was unreliable or mismanaged solely with a view to enticing and inducing investors to purchase large quantities of stocks; failed to allege the reasons that stocks could not and would not be sold through the company before payments on the purchase price would be due; that it was further ambiguous, unintelligible, and uncertain in that it could not be ascertained from its allegations whether it would be contended that there was no intention to deliver the stocks to investors when all payments were made under the budget plan or that defendants would be unable to make delivery; whether it was a part of the scheme to sell securities without sufficient capital to enable delivery or to cause loss to investors through mismanagement and irresponsibility; whether investors were to be lulled into a sense of security by promises to protect them in the event of failure to make payments and, if so, the length of time such protection would be extended; whether the scheme consisted of false and fraudulent pretenses, representations, and promises that the company would purchase and hold stocks, bonds, and securities referred to in the budget plan agreements, but in fact due to lack of sufficient capital and acts of mismanagement it would not make such purchases, or would make such contracts for delivery at a future time and that on account of insufficient capital or acts of mismanagement the contracts would be fraudulently rendered unsafe and insecure. The action of the court in overruling the demurrer is the first grievance presented.

The gist of the offense is the use of the mails for the purpose of executing or attempting to execute the scheme. It is not essential that all the elements of the scheme be pleaded with the technical precision and detail required in alleging the substantive offense. Instead, it is enough if the scheme or artifice is set

690

forth with sufficient certainty and particularity to advise the accused of the nature of the specific charge lodged against him, to enable him to prepare his defense and to plead the judgment in bar to a subsequent prosecution for the same offense. United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516; Havener v. United States (C.C.A.) 49 F.(2d) 196; Butler v. United States (C.C.A.) 53 F.(2d) 800; Rude v. United States (C.C.A.) 74 F.(2d) 673. The essence of the scheme here is that through statements and representations concerning the length of time the company had been in business, its wide range of experience, its contacts and facilities, its integrity and trustworthiness, investors would be induced to purchase stocks, bonds, and securities; that thereafter and through the same means they would be persuaded to sell their stocks and, using the cash paid thereon and the profits derived as a down payment, enter into contracts for the purchase of larger quantities of stocks on the so-called convenient budget payment plan with the promise and assurance that such stocks would increase in market value and could be sold for a profit before further payments were due, but that if investors were unable to make their payments and defaulted, the company would protect them against forfeiture or loss; that in fact they intended to overload such investors and thus make it impossible for them to perform their contracts and upon default to pretend to sell their stocks, close out their accounts and in that manner falsely and fraudulently convert to their own use and benefit the money or property advanced on the contracts. Other things were charged in the indictment, but that was the substance and essence of the scheme; and it was alleged with sufficient certainty and particularity to advise appellant of the offense, to enable him to prepare his defense and to assert the judgment against a later prosecution for the same offense. It follows that the demurrer was rightly overruled.

■ It is persistently argued that there was a variance between the charge and the proof; that appellant was charged with one offense and convicted of another. A large number of investors testified. The testimony of one may be taken as fairly representative of that given by others. The one testified that he resided at Magna, Utah; he first heard of the company through an advertisement in a paper published at Salt Lake City in which the budget plan was mentioned; he asked for some literature and it was sent with a black book having his name in gold on it; he then sent the company some stock with a request that it be sold and the proceeds remitted to him. Shortly thereafter he received a long distance telephone call from a person who said he was Lester Rankin; he was told that he had a balance of $575.98 from the sale of the stock and was asked to leave it with the company for investment; and after some conversation he finally consented to allow a part of the money to be used as a down payment on 100 shares of General Motors. He then began receiving literature on Canada Dry, and shortly afterwards he received another telephone call from Rankin asking that he send a list of his other stocks in order that the company might furnish him an opinion with respect to their value. A few days later he received another call in which it was suggested that he buy 1000 shares of Canada Dry. He stated that it was far too much for him, but the caller assured him that the down payment would be cared for without any trouble and with that assurance he consented. He called the company the next day and succeeded in having the amount reduced to 500 shares. At the request of the company he sent forward 100 shares of Kennecott Copper and 171 shares of Cities Service stock to be sold and the proceeds applied to his credit. About three weeks later Bowers called him and urged that he buy 250 shares more of General Motors. He said he had no money and Bowers persuaded him to send in some stock in the Utah Light & Power Company which he owned as a down payment on the new purchase. That was done and he had then become obligated to make monthly payments of $277. He then called at the office of the company, made inquiry about the payments and was assured that the most he could ever lose in case of a decline in the market would be the government tax and brokerage charge in handling the account. On another occasion he was told that in case it became necessary the company would carry the monthly payments until such time as the stock went up; that the company would take care of it and for him not to worry about it. Bowers called him again and persuaded him to sell everything and apply his investment and prof-

it on the purchase of 500 shares of United States Steel, and in the course of the conversation a guaranty was given him that it would not be necessary to make further payments as the stock would advance before one fell due and he could sell at a profit. His monthly payments were about $600 after that change had been made. Soon after the first monthly payment came due, it was suggested that he change to 3,000 shares of Brillo, the monthly payments thereon being $681. It was referred to as a sleeper which had awakened and he was told that some bankers had a corner on it. He consented that all of his stocks be sold and the money paid thereon and his profits therefrom applied as a down payment on the Brillo. After making one monthly payment on that stock, he went to the office and asked for an extension of thirty days. It was promised him, but instead he received notice ten days later that he had been sold out. He lost $2,957 in cash and stock. In almost every other instance shown in the record, the investor first learned of the company through literature received through the mails; that was followed by long-distance telephone calls; the investor was persuaded to purchase stock and later to change to a larger amount of Brillo, frequently called a sleeper, with assurance that the monthly payments would be cared for and the investor protected against loss; and finally notice was sent that the account had been closed, with demand in some instances for payment of a balance due.

The company had only $531.22 in cash on April 1, 1933, the approximate date on which it began to press the so-called convenient budget purchase plan. From June 1 to June 23, 1933, the company entered into 630 contracts for the sale of stock in the Brillo Corporation. The contracts embraced 204,032 shares of stock, although the corporation had issued only 160,000 shares of common stock at any time during that year. Exclusive of service charge, the sale price of the stock provided in the contracts was $1,825,241.65; the service charge was $182,494.31, making the total price $2,007,735.96; the down payment of 15 per cent. was $282,929.-26 and the monthly installments were in the sum of $48,143.69. No stock was purchased in any corporation on a customer's account until he had paid in full the amount of the contract. The company acquired very little stock in any of the different companies mentioned and usually owned it only a few days, sometimes selling it at a small profit and sometimes at a loss. The salesmen worked on a commission of one per cent. and sold stock only on long-distance telephone. The information which they furnished investors over telephone was acquired by reading various financial journals and the statistical department merely used a series of form letters in disseminating information to investors and prospective investors. Without entering into a detailed review of the vast amount of additional evidence which was introduced, it is manifest that the proof, with its fair and reasonable inferences, established the material elements of the scheme substantially as laid in the indictment. There was no prejudicial variance. See Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

■ Certain books and records of the company were introduced in evidence. It is contended that they were not sufficiently identified; that appellant neither had access to them nor made the entries in them and for such reason was not bound by them. As to identity, Sudbury, a bookkeeper and accountant formerly employed by the company, testified unqualifiedly that they were the books and records of the company. That established their identity. They were introduced solely for the purpose of establishing the volume of business transacted and the financial condition of the company. They were admissible for such purposes even though appellant did not have access to them or make entries in them. Barrett v. United States (C.C.A.) 33 F.(2d) 115; Butler v. United States, supra.

■ Requested instruction numbered 7, seasonably tendered and refused, set forth in detail the statements and representations contained in the indictment and charged the jury that in order to convict they must find and believe beyond a reasonable doubt that all of such statements and representations were made; that they were false and that conviction could not be had upon evidence which established a different scheme or artifice. The instruction was inaccurate in that it was calculated to lead the jury to believe that the falsity of each alleged misrepresentation must be established in order to justify a verdict of guilty. If a number of false representations tending to prove

692

the existence of the scheme are alleged, it is not necessary that all of them be established, if proof of only a part is enough to warrant the jury in finding that the scheme was in fact devised substantially as charged. Havener v. United States, supra; Butler v. United States, supra. Further, the instructions of the court fully and fairly submitted the issues and it is unnecessary to give a requested instruction which is correct in substance if it merely states differently that which has been covered by the court. Shannon v. United States (C.C.A.) 76 F.(2d) 490.

The remaining questions argued are without merit.

Accordingly, the judgment is affirmed.