**UNITED STATES v. FEINBERG et al.**

No. 214.

Circuit Court of Appeals, Second Circuit.

Jan. 31, 1944.

Robert S. Rubin, of Philadelphia, Pa., for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a conviction for conspiracy to use the mails to defraud, and for the substantive offense of using them in a scheme to defraud. The appellants argue that the evidence was not sufficient to support a verdict in a criminal prosecution; but they chiefly rely upon supposed errors occurring during the course of the trial. First, they complain of the opening and closing addresses of the prosecutor; second, they say that the admission of evidence linking the appellant, Feinberg, with a notorious criminal, John Torrio, was extremely prejudicial; and third, they object to the admission of the books of the companies concerned, on the ground that no proper foundation had been laid for them. These are the only objections serious enough to deserve discussion. The facts in general were as follows. The appellant, Feinberg, was the president and the controlling influence in a company engaged in the distribution of liquors in New York City, Prendegast-Davies, Ltd. (which, we shall speak of as P-D). Godfrey, the other appellant, was manager of the Kinsey Distilling Company, of which one, Clarke, was president. (Clarke was also indicted and convicted, but has not appealed). C. H. Graves & Sons Co. was engaged in rectifying, bottling and distributing liquors; all its shares were held by C. H. Graves & Sons Distillers, Inc., of whose shares Feinberg and his wife held eighty-one per cent. (We shall speak collectively of these two companies as Graves.) The interest of Godfrey and Clarke in Graves was that it was a large "outlet" for the Kinsey Company's liquor. The American Beverage Corporation (which we shall speak of as A. B. C.) was a corporation, many of whose shares were held by the public; but its control—72,000 shares—was in the hands of one, McCullough; it manufactured carbonated waters and sold liquor. In December, 1938, Godfrey and Clarke got an option upon McCullough's shares, but later failed to secure the purchase price—$250,-000—and in January, 1939, through them and Feinberg, P-D took over the option and bought the shares with its own money. The prosecution's case rested upon the charge that they later fraudulently misap-

Emanuel G. Kleid, of New York City, for appellants.

594

propriated from A. B. C. the price of the shares, and, after they got control of the company, used it in their own interest. In order to secure the purchase money, Feinberg persuaded certain creditors of P-D not to press their claims against it; and after in this way building up its bank deposits, he was able to withdraw $250,000 with which to pay McCullough. Armed with the shares so acquired, he elected himself, Godfrey, Clarke and others directors of A. B. C., who then voted that that company buy all the assets of P-D—except the A. B. C. shares themselves—and more than 81,000 shares of Graves, in consideration of the promise of A. B. C. to pay all the debts of P-D, amounting to about $900,000. A. B. C. in accordance with this bargain did pay all the debts of P-D, so that the final outcome was that P-D had control of A. B. C. and was free of indebtedness, and that A. B. C. had purchased all the former assets of P-D and 81,000 shares of Graves for $900,000. Whether this was a fraud depended on the value of the property received by A. B. C., which was hotly disputed upon the trial. The accused conceded that as mere matter of book value the tangible property did not equal the indebtedness, but they argued that that value was the least part of the inducement to A. B. C. P-D and Graves, they said, had an exceedingly valuable good will as an "outlet"; and this, coupled with the very substantial tangible assets, much more than equalled the purchase price. The prosecution challenged any such value in the good will; it said that P-D had been losing money in the past, and that Graves was so far in extremis that Clarke and Godfrey, to whose Kinsey Company it was a necessary "outlet", had been looking about to salvage it at all costs. The prosecution further alleged and introduced evidence which, if the jury chose to accept it, proved, that in a number of details the assets of P-D and Graves were not honestly set down in the books. It is not necessary to set out the details of the conflicting evidence; it made issues which a jury might have decided either way.

The situation disclosed, taken as a whole, permitted the conclusion that the sale had been made to obtain control of the business of A. B. C., by means of false statements and in disregard of the interests of the minority shareholders. As we understand it, the accused do not argue that the evidence would not have supported a verdict in a civil case, but they do say that it was not cogent enough to exclude all reasonable doubt of their guilt. Evidence upon an issue which merely preponderates is indeed different from evidence which excludes all doubt; and the same tenderness which imperatively requires the customary admonition to a jury, might also have resulted in a straiter scrutiny of the evidence in a prosecution than in a civil suit, before the issues should be presented to a jury. United States v. Renda, 2 Cir., 56 F.2d 601. Courts have sometimes expressed themselves as though there were a difference. Fraina v. United States, 2 Cir., 255 F. 28, 35; Chicco v. United States, 4 Cir., 284 F. 434; Lempie v. United States, 9 Cir., 39 F.2d 19. It is probable, whatever they say, that in their actual judgments the added gravity of the consequences often makes them more exacting. But courts—at least federal courts—have generally declared that the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases; and that, given evidence from which a reasonable person might conclude that the charge in an indictment was proved, the court will look no further, the jury must decide, and the accused must be content with the instruction that before finding him guilty they must exclude all reasonable doubt. Pierce v. United States, 252 U.S. 239, 251, 252, 40 S.Ct. 205, 64 L.Ed. 542; Matthews v. United States, 8 Cir., 192 F. 490, 494, 495; Stout v. United States, 8 Cir., 227 F. 799, 801; Hays v. United States, 8 Cir., 231 F. 106, 108, affirmed sub. nom. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168; Looker v. United States, 2 Cir., 240 F. 932; Felder v. United States, 2 Cir., 9 F.2d 872, 875; United States v. Rowe, 2 Cir., 56 F.2d 747, 750, 751; Crono v. United States, 9 Cir., 59 F.2d 339. We agree with Judge Amidon in Hays v. United States, supra, 231 F. 106, who refused to distinguish between the evidence which should satisfy reasonable men, and the evidence which should satisfy reasonable men beyond a reasonable doubt. While at times it may be practicable to deal with these as separate without unreal refinements, in the long run the line between them is too thin for day to day use.

We come therefore to the errors in the conduct of the trial. The first, as we have said, is in the conduct of the prosecutor. In his opening to the jury he said

that Feinberg had been convicted of violating the Prohibition Law, 27 U.S.C.A. § 1 et seq., while it was in force. That was an allegation in the indictment, which the judge later refused to let him prove, although he did allow in evidence an order which refused to extend the license of A. B. C. The theory of the prosecutor was that since a permit was necessary to the business it had been a fraud to suppress the fact of Feinberg's conviction when he was to be in charge of the business. We do not see why the evidence should have been excluded, but, that aside, it was certainly reasonable for the prosecutor not to apprehend that it would be; nor did the accused suffer, if his allusion left any trace in the jury's minds, because, as we have just said, the fact of his conviction was admissible anyway.

◼ The next complaint is that in his closing address the prosecutor commented upon the fact that none of the accused took the stand. At first blush this appears as a grave error, but on closer examination it turns out to have been quite justified. The record does not contain the closing address of the accused's counsel and we have it only from the version given by the judge, which was that counsel had said that the jury had heard all the testimony "and the defendants, if they took the stand, could not add anything to that"; and that "they had been interrogated thoroughly." "I know all the testimony. There would not be anything that they could add to what had been testified to." In so assuring the jury, the counsel invited their consideration of what the accused would have said on the stand, and surely he surrendered any privilege they had not to testify. He could not in justice ask that the prosecutor must accept his version unchallenged.

◼ Next is the prosecutor's comment upon the connection of Torrio with Feinberg. In 1935 Feinberg had bought P-D from a man named Slockbower, who was in fact acting for Torrio, and Torrio, the accused assure us, was a notorious bootlegger, although there is nothing in the record upon the matter. The purchase in 1935 was relevant evidence, especially as the contract provided that Feinberg might pay the greater part of the price out of the cash reserves of P-D; but it is not so clear why it added anything to prove that the real seller was not Slockbower, but Torrio. It may be that the prosecution brought this out in the hope that some scandal might attach to Feinberg, but the chance that it succeeded is very tenuous. In the first place, as we have said, nothing appeared in the record to Torrio's discredit, and in the second, even if it had, the mere fact that Feinberg had bought the business from him after it had become lawful, was unlikely to implicate him in Torrio's misdeeds.

◼ Next is that part of the prosecutor's closing address in which he mentioned some newspaper articles which appeared in February, 1939, and which apparently censured the purchase by A. B. C. of the P-D assets and the Graves shares. These articles had come to the notice of all the accused, and there was ample evidence that they were much troubled by the attack upon the transaction. Feinberg was so much so that he thought it expedient to return the shares to A. B. C. as security for an indemnity agreement meant to answer the criticism. Apparently the prosecutor assumed that the articles were incompetent as hearsay, for, instead of offering them in evidence he adopted the common device of getting their purport before the jury by showing what the accused had done in response to them; as though one could properly interpret an individual's conduct without knowing what called it forth. That would perhaps have been improper, if the articles themselves had been incompetent; but, as they were not, no harm was done, for all that the prosecutor implied was that they had criticized the transaction, which they clearly had.

The next objection is to the admission of the books of P-D and of Graves, on which the prosecution's accountant based computations, intended to show that the assets of these companies were not as represented in the balance sheets presented to A. B. C. on January 17, 1939, as the basis for its promise to pay the indebtedness of P-D. There can be no question that these computations were a vital part of the case, and that they were incompetent, unless the books themselves were competent. The books came to be admitted as follows. Immediately after the conclusion of the openings, the prosecutor told the court that he had the books of P-D, Graves, and A. B. C. which he should like to offer for identification, and he suggested that counsel for the accused might be willing "to stipulate that these books and records * * * are the books and records * * * of those companies, subject to verification." The counsel refused to make such a stipulation,

but after some talk "off the record" the prosecutor told the judge without denial by the accused that it had been "stipulated that those are the books of the companies in this list, subject to verification (sic)." Thereupon the books were all marked for identification, and nothing more was said about them until the beginning of the accountant's testimony, some two weeks later, when the prosecutor offered them in evidence. The accused's counsel then objected to their admission on the ground that it had not been shown "that the books had been kept in the regular course of business." It will be observed that this objection did not question that the books were in fact those of the companies; indeed, he could not properly have raised that objection because the stipulation conceded that they were; the condition attached—that they were to be "subject to verification"— meaning no more than that, except as specific objection might be made, all the books were to be regarded as actually books of the companies.

■ That did not however meet the objection that there was no testimony that they had been kept in the regular course of business, or that they complied with the other conditions prescribed in § 695, Title 28 U.S.C.A. Corporate books of account are not competent against a stranger merely because they are the books of the company whose dealings they purport to record. Moreover, it is the general rule that corporate books of account are not competent against shareholders as such (Rudd v. Robinson, 126 N.Y. 113, 26 N.E. 1046, 12 L.R.A. 473, 22 Am.St.Rep. 816), although the law is otherwise as to partnership books, because of the access to them by the partners, and of their supervision and control over them. The officer of a corporation may have the same access to, and control over, the corporate books that a partner has over the firm books; and when he has, they are equally competent against him, being indeed on the footing of admissions. Under this doctrine federal circuit courts of appeal have gone to great lengths—often in prosecutions for misuse of the mails— in admitting corporate books against officers

of a corporation. Indeed, in Taylor v. United States, 5 Cir., 96 F.2d 16, this appears to have been carried so far that nothing more was thought necessary than to identify the books as coming from the proper custody. Most of the decisions are not so extreme, however, and require evidence that the officer was in a position of control or authority in the corporation, and exercised general supervision over the business. The language in which this has been put has varied a good deal, but we need not consider the variants. We are citing in the margin a collection of those decisions which seem to us closest to the situation here.*

■ By virtue of this doctrine, the books of P-D and Graves were competent against Feinberg, who had been in complete control of both companies for a long time; but that will hardly serve as to Godfrey, for he occupied no such relation towards those companies. They were nevertheless competent against him too—and incidentally also competent against Feinberg —under our decision in Parker v. United States, 2 Cir., 203 F. 950, where we held that when the accused, in a prosecution involving the fraudulent use of the mails, has made representations as to the financial condition of a corporation, the books of account of that corporation are competent against him. There can be no doubt of the correctness of that decision. When anyone makes statements as to the financial condition of a corporation, he implies that its books will bear out the truth of what he says, because his hearers will naturally assume that he is speaking of the books, these being ordinarily the only source of information. He is therefore in effect making a statement as to their contents and making them the test of the truth of his utterance. In the case at bar the offer to A. B. C. incorporated statements of the "assets and liabilities" of P-D and Graves, of which the offer said: "we believe both of these statements to be true and correct." Feinberg signed the offer; Clarke presented it to the meeting; Godfrey had helped in its preparation and was present when the offer was presented. Certainly all three

---

* Foster v. United States, 6 Cir., 178 F. 165, 175, 176; Smith v. Moore, 9 Cir., 199 F. 689, 697; Cullen v. United States, 9 Cir., 2 F.2d 524; Arnold v. United States, 7 Cir., 7 F.2d 867; Osborne v. United States, 9 Cir., 17 F.2d 246; Barrett v. United States, 8 Cir., 33 F.2d 115; Weber v. United States, 10 Cir., 80 F.2d 687, 689.

The last two are very extreme decisions; but no more than our own in Hayden v. Williams, 2 Cir., 96 F. 279, where we admitted corporate books of account even against a shareholder.

of them vouchsafed for the correspondence of the books with the statements, and the books became competent against them.

 This did not cover the A. B. C. books, and, arguendo, we may assume that they were erroneously admitted. Nevertheless, their admission did them no prejudice, for no use was made of them in proving the fraud. We do not forget that over objection the judge admitted several statements issued by A. B. C. to its shareholders; one as of November, 1939, and a second as of November, 1940; and that he also admitted reports of accountants for the company to the board of directors. These stand on a different basis from the books, and were admissible against all who were directors at the time. Such as were merely reports of accountants addressed to the board, the board was charged with the duty of examining; such as were disseminated among the shareholders, the board presumably authorized to be sent out. Feinberg left A. B. C. in December, 1940, and Godfrey in January, 1940; and we will assume that the report for the year ending November 30, 1940, was incompetent against both. True, we cannot say that its admission could have done the accused no damage, for apparently it was used to rebut their assertion that the losses of A. B. C. during 1940 were due to a "price war." Yet it would be wholly unwarranted to reverse the conviction because of so trifling a single lapse in the course of so long a trial. As to the relevancy of the reports relating to 1939, we are not clear that. they proved anything of importance; but certainly it was proper to show what the accused did with A. B. C. after they got possession of it.

 Finally, the motion to set aside the verdict on the ground of the evidence as to Torrio was properly denied. It was made upon unsworn statements of counsel, and it added nothing to the objection made at the trial. Moreover, it was the purest speculation whether any of the jury knew that Torrio was a notorious lawbreaker, if in fact he was, or whether they had seen a newspaper article which coupled him with the well-known criminal, Capone. Besides, such a motion always lies in the discretion of the judge. The accused had a fair trial; and the issues were for the jury, who were satisfied of their guilt. The closing address of .the prosecutor did in spots lapse into those unhappy vulgarisms, which for some curious reason prosecutors so often appear to think persuasive with jurors, but which are quite as likely to offend them in their implication that they can best be convinced by such rhetoric. But the bad taste of the prosecutor is no reason for releasing the criminal; and in the case at bar the summing up did not misstate the testimony—in spite of what the accused say—; did not ask the jury to infer anything which in reason they should not; and in violence of expression was within the regrettable latitude which has long been common.

Judgment affirmed.