**UNITED STATES of America**

v.

**Edward Nicholas HURLEY, Michael Bourne Rutt, Mildred Maffei, Eldred Mowery, Jr. and Frederick Bernard Wehage, III.**

**Crim. No. 11964.**

United States District Court
D. Connecticut.

Jan. 25, 1968.

Jon Newman, U. S. Atty., Samuel Heyman, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Ira Grudberg, New Haven, Conn., for defendant Hurley.

William C. Lynch, New Haven, Conn., for defendant Rutt.

John F. Zamparelli, Medford, Mass., for defendant Maffei.

John C. Snow, Provincetown, Mass., for defendant Mowery.

Leonard Levy, New Haven, Conn., for defendant Wehage.

MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR NEW TRIALS

ZAMPANO, District Judge.

On March 29, 1967, a grand jury returned a one-count indictment charging each of the named defendants with vio-

lating the National Stolen Property Act, 18 U.S.C. § 2314. The indictment specifically charged that on or about March 10, 1967, the defendants did transport and cause to be transported certain stolen paintings from Massachusetts to Connecticut, knowing them to have been stolen. Defendant Rutt pleaded guilty to this indictment, defendant Wehage pleaded nolo contendere and was found guilty by the Court, and the case against defendant Maffei was not prosecuted. On June 27, 1967, the defendants Hurley and Mowery were convicted after a nine-day jury trial. These defendants now move for judgment of acquittal or, in the alternative, for a new trial.

The jury reasonably could have found the following facts. On December 7, 1966, at approximately 1:30 A.M., defendants Wehage and Mowery burglarized the Hans Hofman home in Provincetown, Massachusetts, and removed a number of valuable paintings. Because they were unable to dispose of these well-known art works, the defendants stored them at the homes of various relatives. Finally, on January 15, 1967, Wehage contacted defendant Rutt, a person reportedly knowledgeable in "fencing" stolen goods. After meeting with Wehage and Mowery, Rutt conceived the idea of selling the paintings to Hofman's insurer for a "reward".

Rutt learned that the General Adjustment Bureau in Cape Cod was the local representative of Hofman's insurance company. When Rutt called this agency and informed its representative that he had access to the paintings, the representative promptly notified the F.B.I. Acting upon instructions of the Bureau, the local agent referred Rutt to the company's "main office" in New York. On March 3, 1967, Rutt (using the name "Johnson") called the office in New York and talked to Joseph MacFarlane, an F.B.I. agent who was posing as a representative of the General Adjustment Bureau. After some negotiations, Rutt and MacFarlane agreed that the company would pay $25,000 for the return of the paintings. Rutt informed MacFarlane that he intended to contact his lawyer who, in turn, would handle the remaining details of the transaction.

Later that day, Rutt telephoned the defendant Hurley, an attorney in Springfield, Massachusetts, with whom Rutt had had previous social and professional contact. Rutt disclosed to Hurley the substance of his prior discussions with MacFarlane and asked Hurley if he could prepare a legally enforceable contract which would embody the terms of the agreement. Rutt promised Hurley a $5,000 fee. Hurley replied he would look into the legality of the matter.

On March 3, 1967, Rutt also met Mowery and Wehage. He informed them that he was dealing with a representative of the company in New York City and related to them the results of his negotiations to date.

On March 6, 1967, Hurley telephoned MacFarlane on two occasions. In these conversations, Hurley identified himself and stated "Johnson" had requested him to negotiate the return of the paintings. Delivery of the paintings and the payment of the money were discussed. Hurley then called Rutt and told him that the negotiations were progressing and that he would be in Boston the next day to see the paintings. However, on March 7th, Hurley was unable to travel to Boston because of a snow storm. On March 8th, Hurley met Rutt in Boston, and they transferred the paintings to Springfield. While on the return trip, Hurley telephoned MacFarlane from Framingham, Massachusetts, to tell him that he had observed the paintings and that delivery would be made for $25,000. Hurley also stated he wanted a written "authorization" from MacFarlane to continue the negotiations between the parties. When Rutt and Hurley returned to Springfield, Hurley registered Rutt at a motel under the name "Michael Johnson".

On March 9th, Hurley and MacFarlane again discussed the terms of the transfer, and Hurley dictated the text of the "authorization" he wished to receive from MacFarlane. In addition, Hurley requested a $2,000 fee from the com-

pany, indicating that the individuals who had the paintings desired to clear $25,000 for themselves. MacFarlane agreed to the additional payment, and arrangements were made to transfer the $27,000 through several banks so that the payment would eventually be made to Hurley's account. After some discussion—MacFarlane requesting that Hurley bring the paintings to New York and Hurley requesting MacFarlane to come to Springfield—the parties agreed to meet halfway at a motel in New Haven, Connecticut.

On the following day, after receiving MacFarlane's "authorization" by telegram, Hurley took possession of the paintings at Rutt's motel and drove to New Haven with two friends. The paintings were carried into the New Haven motel where MacFarlane and an "art expert" (another F.B.I. agent) examined them. Shortly thereafter, local and federal officers arrived and arrested Hurley. The other defendants were taken into custody subsequently.

Under the circumstances of this case, the Court charged the jury, among other things, that there were three basic questions before them:

1) Did the paintings involved have a value in excess of $5,000 and were they stolen?

2) Did either or both of the defendants transport or cause to be transported these paintings in interstate commerce, knowing they were stolen?

3) Did either or both of the defendants act with criminal intent?

The Court instructed the jury that if, with respect to either defendant, they found any one of the above questions should be answered in the negative, then, as to that defendant, they must acquit. After the Court's charge, the defendants excepted to one portion of the charge which they claimed might be confusing or ambiguous. The Court promptly recharged the jury according to counsel's suggestions, and no further exceptions were taken.

The defendant Mowery now contends the evidence was not sufficient to sustain the findings implicit in the jury's verdict that he "transported or caused to be transported" the paintings across state lines and that he acted with criminal intent. The Court disagrees. The jury properly determined that Mowery was a member of a joint venture to carry out an unlawful scheme to dispose of the paintings for profit. He definitely knew through Rutt that "New York people" were involved in the transaction, and he knew or reasonably should have known that the paintings might cross state lines in the course of the transaction. By his conduct he caused, aided and induced the interstate transportation of the paintings from Massachusetts to Connecticut. See United States v. Tannuzzo, 174 F.2d 177, 180 (2 Cir. 1949), cert. denied, 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed. 493; United States v. Kierschke, 315 F.2d 315, 317 (6 Cir. 1963). Therefore, the defendant Mowery's motions for a judgment of acquittal and for a new trial are denied.

Defendant Hurley claims the verdict as to him should be set aside because: 1) the Supreme Court in United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946), excluded his conduct from the reaches of 18 U.S.C. § 2314; 2) newly discovered evidence casts grave doubt on the truthfulness of Rutt's testimony; and 3) the evidence was insufficient to support the verdict.

I.

The indictment charges Hurley with a violation of the first paragraph of 18 U.S.C. § 2314, which reads in pertinent part: "Whoever transports in interstate * * * commerce any goods, * * * of the value of $5,000 or more, knowing the same to have been stolen * * *" shall be guilty of a crime. Unlike the remaining paragraphs of Section 2314 concerning forged securities and counterfeiting tools, the proscribed transportation of stolen goods in the first paragraph does not require by its terms an unlawful or fraudulent intent, but only

knowledge that the goods were stolen. In *Sheridan,* supra, the Supreme Court stated that this difference in language was "entirely procedural, not substantive in character." 329 U.S. at 385, 67 S.Ct. at 335. By way of further explanation the Court said in a footnote:

One who knowingly transports stolen goods would do so for one of three sorts of objects, namely: (1) to dispose of them or use them unlawfully; (2) to aid in concealing the theft, thus avoiding prosecution for himself or another; or (3) for some purpose wholly innocent, such as to turn them over to the police or the rightful owner.

In the first two instances there would be inherent in the act "unlawful intent" or "fraudulent intent," though proof of this might not be required apart from the proof of knowledge and absence of any showing of innocent purpose. Congress obviously did not intend to make criminal such an instance as the third. However, proof of the innocent intent might be required as matter of defense, the other elements being made out. In other words, it may well be doubted that adding the requirement "with unlawful or fraudulent intent" in the amended part of the section added anything to the substantive crime; for its effect is apparently only to require the state to allege and prove the unlawful or fraudulent intent, rather than to require the defendant to allege and prove his innocent purpose. 329 U.S. at 385, 67 S.Ct. at 335, n. 11.

At trial (and in the motions pending before this Court) Hurley contended that this dictum by the Supreme Court effectively insulates his conduct from the statute's proscriptions because he unquestionably believed the paintings eventually would be returned "to the rightful owner." The government, on the other hand, claimed the Supreme Court's footnote merely indicates that the prosecution does not bear the burden of proof on the issue of "intent." The government argued that, having proved Hurley transported the paintings across state lines knowing they were stolen, it had established its case-in-chief, and the burden thereupon shifted to Hurley to show "innocent intent or purpose" or "lack of criminal intent."

■ The defendant's interpretation must be rejected. The main thrust of the Supreme Court's comments was to make clear that one is exempt under the statute if the forbidden transportation was for a wholly innocent purpose. The examples stated by the Court—the turning over of stolen property to the police or the rightful owner—are conditioned on the premise that there is "innocent intent or purpose."

■ The government's interpretation is more appealing, particularly since the principle is now well established that possession of property recently stolen, if not satisfactorily explained, is a circumstance from which a jury in the light of all the evidence may infer guilty knowledge and participation in the theft. United States v. De Sisto, 329 F.2d 929, 935 (2 Cir. 1964), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747.

However, the Supreme Court's footnote offers only a possible construction of 18 U.S.C. § 2314. It does not explicitly say that the defendant *must* bear the burden of proving his innocent intent. Therefore, this Court, in an excess of caution, placed the burden of proof on this issue upon the government. See United States v. Byrd, 352 F.2d 570 (2 Cir. 1965). The instructions to the jury thus were more favorable to the defendant than perhaps was merited, and he cannot now complain.

## II.

Hurley also moves for a new trial on the ground that newly discovered evidence reveals Rutt perjured himself at trial. The Court held a hearing on this claim on September 18, 1967, at which time the defendant's witness, Robert Fountain, and the government's witness, Rutt, testified. Their testimony concerned certain conversations between them while both were confined at the

Haddam County Jail in Springfield, Massachusetts. At that time Rutt was incarcerated awaiting the trial of this case. Fountain, who has an extensive criminal record, was awaiting sentencing for a felony conviction.

The material testimony concerned two statements attributed to Rutt by Fountain. Hurley claims that these statements cast such grave doubt on Rutt's trial testimony that a new trial must be ordered. The first statement was Rutt's answer when Fountain asked him about Hurley's fee for arranging with the insurance company for the return of the paintings. Rutt allegedly replied, " * * * after these paintings were recovered by the insurance company, Attorney Hurley would receive a sum, a percentage from an adjustment bureau for his services." (Tr. p. 13). Rutt, called by the government in rebuttal, denied he made this statement to Fountain.

As the record will disclose, Fountain's testimony on this point was ambiguous and conflicting. This Court finds it unconvincing. In any event, there is no reason to believe that such evidence at a new trial would likely result in an acquittal. It is not new evidence bearing on Hurley's guilt or innocence, but merely evidence bearing on Rutt's credibility. United States v. Curry, 358 F.2d 904, 919 (2 Cir. 1965), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966).

The second statement concerned Rutt's attitude toward Hurley. Rutt allegedly told Fountain that he was going to "hang" Hurley because Hurley failed to arrange bail for him pending trial. Rutt denies the threat. At the trial, Rutt was cross-examined at length concerning his feelings toward Hurley and his possible motives for perjury. Even assuming the truth of Fountain's testimony, such evidence is merely impeaching and, as such, is insufficient to warrant a new trial. See United States v. Curry, supra; United States v. Switzer, 252 F.2d 139, 146 (2 Cir. 1958), cert.

denied, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366.

### III.

Hurley also moves for judgment of acquittal on the ground that the evidence, as viewed most favorably to the government, is insufficient to support the conviction.

The facts of this case, viewed as the law requires, have been set forth above. Hurley does not deny performing the overt aspects of the crime—carrying the stolen paintings from Massachusetts to Connecticut. The only element of the offense charged which he contests is his intent. The government contends that the facts proved at trial establish Hurley acted with criminal intent in that he joined with Rutt and the thieves in an unlawful venture to exact payment from the insurance company in exchange for the stolen paintings. Hurley, on the other hand, claims that at all material times he intended to act not as the agent of the thieves, but as the insurance company's agent or at least as an honest middleman.

With respect to the issue of Hurley's intent the parties introduced conflicting evidence on two crucial questions of fact. The first question was whether Hurley contracted with Rutt to accept $5,000 as his "share" of the "reward" of $25,000. Rutt testified he did. Hurley denied it and claimed he was to receive $2,000 from the insurance company for services on its behalf. The second question concerned Hurley's intent in demanding an "authorization" from the company. The government argued that Hurley wanted the authorization as part of an "eleventh hour" stratagem to provide legal cover for himself in the event the illegal plan came to the attention of police authorities. The government based this contention on MacFarlane's testimony that Hurley did not request the authorization until March 8, 1967, at which time all the arrangements had been completed except for the exact time and place of delivery. Hurley, on the other hand, testified the telegram received

on March 10th was a written confirmation of discussions, commenced on March 6th, and of previous oral understandings that he would act as the agent of the company. Hurley claimed he would not have participated in the transaction without such oral and written assurances.

■ It seems clear the jury resolved these factual questions in the government's favor based on evidence which this Court regards as sufficient to justify an inference that Hurley acted with criminal intent.

Therefore, there being substantial evidence to support a finding of criminal intent, and all the remaining essential elements of the crime having been proved beyond a reasonable doubt, the Court must deny the defendant's motion for judgment of acquittal. See United States v. Masiello, 235 F.2d 279 (2 Cir. 1956), cert. denied, Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L. Ed.2d 79; United States v. Feinberg, 140 F.2d 592, 154 A.L.R. 272 (2 Cir. 1944), cert. denied, 322 U.S. 726, 64 S. Ct. 943, 88 L.Ed. 1562; United States v. Wapnick, 202 F.Supp. 712 (E.D.N.Y. 1962), aff'd per curiam, 315 F.2d 96 (2 Cir. 1963), cert. denied, 374 U.S. 829, 83 S.Ct. 1868, 10 L.Ed.2d 1052. But see United States v. Melillo, 275 F.Supp. 314 (E.D.N.Y.1967).

### IV.

■ However, different considerations apply to Hurley's motion for a new trial on the ground that the verdict is against the weight of the evidence. On such a motion, the Court may weigh the evidence and consider the credibility of witnesses. If the Court determines "the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted." United States v. Robinson, 71 F.Supp. 9, 10 (D.D.C.1947). See also United States v. Wapnick, supra, 202 F.Supp. at 714.

■ This power obviously should be exercised cautiously and sparingly. Due respect must be accorded a jury's verdict. Yet, where justice dictates that a verdict should not stand, the Court is under a duty to act.

In the instant case the only contested issue before the jury was Hurley's intent. To resolve this issue the jury had to rely on inferences drawn from proven facts concerning Hurley's actions and statements. At trial Hurley's *acts* were not matters of serious contest. Hurley, however, vigorously challenged the government's version of his statements in two respects: the conversation with Rutt concerning a fee and the conversation with MacFarlane relating to the authorization. As stated previously, it seems obvious the jury resolved these crucial factual questions against Hurley. If these factual issues were joined before the jury as matters of clear-cut conflicts in testimony, the jury's decision would remain inviolate. But such was not the case. The direct testimony of Rutt and MacFarlane was subject to serious impeachment by prior inconsistent statements and by independent evidence.

Rutt testified at trial that on March 3rd he offered Hurley $5,000 as a fee and Hurley accepted it as reasonable. On cross-examination, Rutt clearly indicated Hurley was hesitant about the employment and wanted "to check the legality" of the matter. A definite fee arrangement at that time seems unlikely. Moreover, and more importantly, Rutt was confronted by a series of prior inconsistent statements given to the F. B.I. on this issue. The first statement to the F.B.I. was labeled "all lies" by Rutt. In his next written statement, Rutt said the fee was discussed on March 3rd, but not agreed upon. In yet another written statement, taken by an experienced, competent agent, Rutt stated Hurley had demanded the $5,000 on March 3rd and Rutt agreed to it. Rutt's explanations of these discrepancies were vague and confusing and, to the extent he implied Agent Glossa misquoted him, incredible.

MacFarlane testified on direct that on March 6th Hurley telephoned him only once; that there was no mention of an

authorization during that conversation; that Hurley first mentioned an authorization on March 8th, at which time the telegram was dictated by Hurley; and that there was a final telephone call on March 9th. During his testimony, MacFarlane relied on his written report, typed from certain original notes which were destroyed prior to trial. On cross-examination MacFarlane reiterated that there were only three telephone conversations between himself and Hurley from March 6th through March 9th and that the telegram was dictated on March 8th, when the subject of the authorization first came up. Despite the fact that the telegram referred to a telephone conference "of March 9", MacFarlane insisted it was dictated to him on March 8th.

Hurley's testimony about these telephone calls varied significantly from MacFarlane's. He claimed that he telephoned MacFarlane twice on March 6th; that MacFarlane called him once on March 7th and twice on March 8th; that he talked to MacFarlane four times on March 9th; and that he dictated the telegram on March 9th. Hurley accounted for these telephone conversations as follows. On March 6th, Hurley telephoned MacFarlane in the morning to verify Rutt's story about talking to MacFarlane on March 3rd. Hurley then researched the legality of the proposed transaction at the law library and spoke to some attorney friends about it. He concluded that he could participate in the exchange if the insurance company authorized him to obtain the paintings in its behalf and if "safe conduct" for the thieves was not part of the bargain. Hurley then called MacFarlane that same afternoon and requested a written authorization from the company. When MacFarlane indicated the company would not send a written authorization, Hurley refused to become involved and ended the conversation.

On March 7th, according to Hurley, MacFarlane telephoned, but did not reach Hurley. On March 8th, MacFarlane telephoned Hurley, stated that the company would send a written authorization, and

confirmed the price of $25,000. On March 9th, the several telephone calls between the parties concerned Hurley's fee of $2,000, the transfer of the fund of $27,000 through various banks to Hurley's own account, the text of the telegram and the place of delivery of the paintings on March 10th.

At this point in the trial the serious inconsistencies between the testimony of MacFarlane and Hurley were apparent. But the resolution of these inconsistencies turned entirely on the credibility of the witnesses, a matter exclusively for the jury. One may assume MacFarlane had the edge: he was a trained, experienced investigator; his contemporaneous notes should be more reliable than Hurley's recollection; he, and not Hurley, was aware that these conversations would be material evidence in a criminal case; and his version of the conversations was corroborated by another F. B.I. agent who was listening on an extension phone. Thus, if matters had come to rest at this stage of the proceedings, the jury's resolution of the factual conflict in the evidence would control, and this Court would not intervene.

Surprisingly, however, it was Hurley who thereafter introduced incontrovertible documentary evidence which supported his testimony to a large degree. Records of the telephone company, coupled with Hurley's own office telephone memos (prepared by third parties), verified Hurley's testimony as to the number, dates, and times of the telephone calls between MacFarlane and Hurley.

These records are highly significant. For example, the time when Hurley demanded an authorization was a prime indication of his intent. Hurley testified that he called MacFarlane on the afternoon of March 6th to discuss the authorization and certain other matters. MacFarlane denied that Hurley even called him on that afternoon. But the telephone company's records indicate that at 4:15 P.M. on March 6th there was a ten-minute, person to person call from Hurley to MacFarlane. Again, MacFarlane testified that Hurley first

mentioned an authorization during a lengthy telephone conversation on March 8th. During this call, said MacFarlane, he and Hurley worked out the details of payment and delivery, and Hurley dictated the text of the telegram. Hurley admitted speaking with MacFarlane on March 8th, but denied MacFarlane's account of the conversation. The telephone company records indicate only a four-minute conversation on March 8th— clearly an insufficient amount of time to corroborate MacFarlane's testimony.

At trial, in the absence of the jury, the Court requested the Assistant United States Attorney to explain the apparent "confusion" in MacFarlane's testimony. The government did so by recalling MacFarlane on rebuttal. He explained that his written records were in a "mish-mash" because "of several other investigations we had going." Although stoutly maintaining Hurley never requested an authorization on March 6th, he did correct significant portions of his prior testimony so that it conformed to the telephone records and to Hurley's recollection. Moreover, he agreed that Hurley "insisted" on an authorization.

It is the Court's firm belief that the record on these pivotal factual questions does not measure up to the standard required to support the verdict in this case. Even though on rebuttal the government sufficiently rehabilitated its honeycombed case-in-chief to avoid a judgment of acquittal, the Court, in justice, cannot conclude that the state of the evidence is sufficient to deny a motion for a new trial.

In the light of this decision the government may review its evidence in a calm and unhurried fashion and reconstruct the true facts of this case. After such a review it may decide to proceed further against defendant Hurley. If so, it can again marshal its evidence before a new jury in the logical and consistent manner characteristic of presentations by the prosecutors of this District. On the other hand, the government may conclude that, under the circumstances here, justice would best be served by a dismissal of the case. It now has the time and the opportunity to decide.

Accordingly, defendant Hurley's motion to set the verdict aside and for a new trial is granted.