HAMMOND OIL COMPANY, Respondent, v. STANDARD OIL COMPANY, Appellant, Impleaded with Another.

314

(Argued May 10, 1932; decided June 7, 1932.)

*Clarence J. Shearn* and *Chester O. Swain* for appellant. The agreement of December 30, 1919, was not a contract of joint adventure, but was a simple sale of an option. (*Ross* v. *Willett*, 76 Hun, 211; *Hutchinson* v. *Birdson*, 211 App. Div. 316; *Hardin* v. *Robinson*, 168 App. Div. 724; *Pattison* v. *Blanchard*, 5 N. Y. 186; *Columbian Laundry* v. *Hencken*, 203 App. Div. 140; *Reynolds* v. *Searle*, 186 App. Div. 202; *Thompson* v. *Batcheller*, 134 App. Div. 506; *Walker* v. *Tupper*, 152 Penn. St. 1; Partnership Law, § 11; *Oppenheimer* v. *Van Raalte*, 151 App. Div. 601; *Smith* v. *Bodine*, 74 N. Y. 30; *Hill* v. *Curtis*, 154 App. Div. 662; *Peirce* v. *McDonald*, 168 App. Div. 47; *Clark* v. *Rumsey*, 59 App. Div. 435; 178 N. Y. 592.)

*Ellwood M. Rabenold* for respondent. Levering & Co. was under a fiduciary duty to Imbrie & Co. as evidenced by the letter of October 22, 1920, and defendant took over the options subject to the same duty. (*May* v. *Hettrick Bros. Co.*, 181 App. Div. 3; 226 N. Y. 580; *Underhill* v. *Schenck*, 238 N. Y. 7; *Meinhard* v. *Salmon*, 249 N. Y. 458; *Boice* v. *Jones*, 106 App. Div. 547; *Franken-Karch Corp.* v. *Castriotis*, 195 App. Div. 529; *Tate* v. *Williamson*, L. R. 2 Ch. App. Cas. 60.) What defend-

ant purchased from Levering & Co. were advantages inherent in the options as well as strict contract rights; and defendant having used such advantages to acquire the properties, they are subject to plaintiff's claim in equity. (*Matter of Brown*, 242 N. Y. 1; *Meinhard* v. *Salmon*, 249 N. Y. 458; *Mitchell* v. *Reed*, 61 N. Y. 123; *Gaddie* v. *Mann*, 147 Fed. Rep. 960; *May* v. *Hettrick*, 181 App. Div. 3; *Underhill* v. *Schenck*, 238 N. Y. 7; *Brown* v. *Leach*, 189 App. Div. 158; *Lonabaugh* v. *Midwest Refining Co.*, 285 Fed. Rep. 63.) The written agreements for the percentage were not limited to a purchase of the concessions by the exercise of the option for they extended to any purchase made on continuous pursuit, consequent upon the option relation. (*Simon* v. *Etgen*, 213 N. Y. 589; *Valdes* v. *Larrinaga*, 233 U. S. 705; *Cleveland Cliffs Iron Co.* v. *Gamble*, 201 Fed. Rep. 329; *Hussey* v. *Flanagan*, 237 N. Y. 227; *Foley* v. *N. Y. Mutual Ben. Soc.*, 141 App. Div. 180; 208 N. Y. 538.) There was continuous pursuit and the purchase was consequent upon the options. (*Meinhard* v. *Salmon*, 249 N. Y. 458; *May* v. *Hettrick*, 181 App. Div. 3; 226 N. Y. 580; *Valdes* v. *Larrinaga*, 233 U. S. 705; *Gamble* v. *Cleveland Cliffs Iron Co.*, 158 Fed. Rep. 49; *Cleveland Cliffs Iron Co.* v. *Gamble*, 201 Fed. Rep. 329.)

KELLOGG, J. At La Paz, Bolivia, on October 10th, 1919, John S. Hammond, representing Imbrie & Co., a New York banking house, and Ivar Hoppe entered into an agreement which was recorded in the records of a notary at La Paz.

The agreement recited that Hoppe had been awarded two oil concessions by the government of Bolivia, one termed " Ayacucho," consisting of 48,900 hectares; and the other, termed " Enriqueta," containing 7,850 hectares. The agreement provided that Hammond should have an option to purchase these concessions at a price, for Ayacucho, of £35,000, and, for Enriqueta, of £15,000; that he

should have three months to determine whether to accept the transaction; that if he should give notice of acceptance within three months he must send out a technical commission to make surveys of the land, and must pay the taxes for the first half of the year 1920; that the commission should have four months within which to report; that, if drillings were necessary, it should have four additional months; that, in such event, the purchaser was to pay the balance of the taxes for 1920; that, if the purchaser should find the surveys satisfactory, he should have three more months to perfect the contract of sale. It will be seen that Hammond, if he paid the taxes for the first half year, was to have ten months within which to exercise the option; if drillings were necessary and he paid taxes for the second half year, he was to have an additional four months. In the one event, therefore, the option was to expire on August 10th, 1920; in the other, on December 10th, 1920.

On December 30th, 1919, Hammond, acting for Imbrie & Co., entered into an agreement with Fred Bielaski, acting for Richmond Levering & Co., Inc., of New York, which was entered in the records of a notary at La Paz, Bolivia.

This agreement makes reference to the option on Ayacucho and Enriqueta which Hammond acquired. By it Hammond " transfers and assigns said option under the terms and upon the clauses of the aforementioned instrument of October 9th of the current year, to Mr. Fred Bielaski, representing the Richmond Levering Company, Inc." Bielaski " undertakes to allow to Mr. John S. Hammond " by way of remuneration for this transfer of his rights and interests on and in the oil claims Ayacucho and Enriqueta as follows: " (a) 10% of the gross output of any oil or oil products obtained from the lands covered by this option, which oil or oil products shall be delivered at the terminal stations of the oil pipes that are being erected by the Richmond Levering Com-

pany for the working of the fields; (b) at the time of the execution of this instrument, and in settlement of all other rights, a sum in legal tender currency of 15,000 Bolivianos, which Mr. John S. Hammond acknowledges to have received to his entire and complete satisfaction." Levering & Co. undertakes to make all proper surveys, and, if its engineers reported favorably, to make all necessary drillings. Hammond is to have recourse to the reports of the engineers, and may co-operate in making surveys and researches through his own personnel.

On January 5th, 1920, within the three months' period prescribed therefor in the option from Hoppe, Levering & Co., the transferee thereof, notified Hoppe of its acceptance of the transaction. It thereby obligated itself merely to the extent of paying the taxes for the first half of the year 1920, and of sending a commission to examine the properties. Levering & Co. did thereafter, in compliance with the terms of the Hoppe option, send out a commission to make surveys and report.

Prior to April 1st, 1920, Levering & Co. acquired a number of private concessions in the Bolivian field, and had procured a concession from the Bolivian government of oil rights in 1,000,000 hectares of land. On May 15th, 1920, Levering & Co. and the defendant the Standard Oil Company entered into " an agreement for a joint enterprise " or " partnership." Levering places at the disposal of Standard Oil its concession contracts, the Bolivian government concession for 1,000,000 hectares, as well as the Ayacucho and Enriqueta concessions, its entire Bolivian organization, as well as all its reports and data. During six months Levering is to refrain from negotiating with others than Standard Oil. At the end of this period Standard Oil is to determine whether it will proceed with a joint adventure with Levering. In case it does, Standard Oil is to pay Levering $1,050,000; the concessions are to belong to the partnership; the Standard Oil is to manage the enterprise; and the respective interests are to be

Levering $22\frac{1}{2}\%$, Standard Oil $77\frac{1}{2}\%$. The six months' period was subsequently extended to January 31st, 1921. In pursuance of this agreement Standard Oil received from Levering its reports of the explorations made by its technical commission, and sent out its own geologist to explore the lands.

During the period between May 15th and October 5th, 1920, pursuant to advices from Standard Oil that $12\frac{1}{2}\%$ was the maximum royalty which could be paid, Levering & Co. procured the consent of Imbrie & Co. to reduce their participation in Ayacucho and Enriqueta concessions from $10\%$ to $2\frac{1}{2}\%$, so that with royalties payable to the government, the maximum of $12\frac{1}{2}\%$ would not be exceeded.

In September, 1920, Hoppe made a claim that the option granted to Hammond for Imbrie & Co. had expired. Since drilling had not been found necessary, this was, indeed, the fact. On the 24th of that month, at La Paz, Bolivia, Hoppe and Fred Bielaski, representing Levering & Co., entered into a formal agreement in writing, canceling the option of October 10th, 1919, executed by Hoppe to Hammond, except for the obligation of Levering to pay taxes for the second half of 1920. On October 6th, 1920, Hoppe and Bielaski entered into new option agreements covering the concessions Ayacucho and Enriqueta. The agreements gave Levering an option to purchase Ayacucho for $127,000, and an option to purchase Enriqueta for $52,000. These options were terminable on December 1st, 1920, if the installments of the purchase price due that day were not paid.

On October 22d, 1920, Imbrie, having learned of the cancellation of the original option and the acceptance of a second option, wrote Levering, expressing a desire that the latter would make a declaration that these acts would not affect the contract obligations between the parties and that " in any development of the enterprise, whether in exercise of the option or consequent upon the option,

our participation as agreed upon between us to the extent of not less than two and one-half per cent of the brute product of petroleum or its derivatives shall be recognized." On the same day Levering, using language almost identical, made reply, saying: " I am very glad to assure you that any instruments of cancellation executed by us or in our name and delivered in Bolivia, or elsewhere, relating to the subject matter of the contract between us shall not in any way be deemed to affect or impair the contractual obligation between us, and that in any development of the enterprise, whether in exercise of the option or consequent upon it, your participation as agreed upon between us shall be recognized to the extent of not less than two and one-half per cent of the brute product of petroleum or other hydrocarbons."

The options of October 6th, 1920, were not exercised, and expired on December 1st, 1920. From December 1st, 1920, to January 11th, 1921, there were no outstanding options, and Hoppe was free to deal with the concessions as he saw fit. On January 11th, 1921, Levering & Co. obtained new options from Hoppe and paid him $5,000 in cash therefor. The options provided for a price of $127,000 for Ayacucho, and for Enriqueta a price of $52,000. If the installments of payments due on June 1st, 1921, as provided in the option, were not made, the options were to terminate.

On January 31st, 1921, the defendant Standard Oil Company had not given Levering & Co. notice that it elected to enter into partnership with it, as provided for in the agreement of May 15th, 1920. Accordingly, the agreement of that date was no longer effective. Thereafter, on March 3d, 1921, the Standard Oil made an outright purchase from Levering & Co. of all its Bolivian concessions, for the sum of $550,000. This purchase included the government concession of 1,000,000 hectares, as well as the Ayacucho concession of 48,900 hectares and the Enriqueta concession of 7,850 hectares. Attached

to this agreement were copies of the options granted by Hoppe on January 11th, 1921; also a copy of Levering's letter to Imbrie & Co. dated October 22d, 1920.

The payments required to be made on June 1st, 1921, by the option of January 11th, 1921, granted by Hoppe to Levering, were not forthcoming, and the option expired. During the following four months Hoppe made numerous efforts to sell his concessions to Levering & Co. and to various other concerns interested in oil. During August and September various negotiations were had between Armstrong, representing the Standard Oil, and Hoppe for the purchase by the Standard Oil direct, of the concessions held by Hoppe. On October 14th, 1921, the purchase of the Ayacucho concession by the Standard Oil was closed at $55,000; on October 21st, 1921, the purchase of Enriqueta was closed at $7,850. The Standard Oil Company took title to the concessions in the name of the Standard Oil Company of Bolivia, all the stock in which was owned by the defendant the Standard Oil Company.

Upon these facts, it has been held that the plaintiff, as the successor in interest of Imbrie & Co., is entitled to $2\frac{1}{2}\%$ of the brute product recovered from the oil wells on Ayacucho and Enriqueta by the Standard Oil Company of Bolivia. This holding is based upon the theory that Imbrie & Co. and Levering & Co., by their agreement of December 30th, 1919, became joint adventurers in the exploitation of the Ayacucho and Enriqueta oil fields; that their fiduciary relationship was such that a new option taken upon the same fields by Levering, after the expiration of the option referred to in the agreement, must be deemed to have become subject to its provisions precisely as had been the expired option; that when the Standard Oil purchased the Levering interests the option acquired remained subject to the same provisions; that its relationship to Imbrie & Co. became such that when it acquired concessions upon the same land for itself, the

provisions of the agreement attached to give Imbrie & Co. a $2\frac{1}{2}\%$ interest in the brute product of the wells which it subsequently established thereupon.

We do not conceive that the agreement of December 30th, 1919, created between Imbrie & Co. and Richmond Levering & Co. the relationship of partners, joint adventurers, trustee and *cestui que trust*, or any fiduciary relationship whatsoever. By that agreement Hammond, acting for Imbrie & Co., " transfers and assigns " to Fred Bielaski, acting for Levering & Co., an option to purchase oil concessions in Ayacucho and Enriqueta. Bielaski pays to Hammond 15,000 bolivianos therefor. He also stipulates, as an additional consideration, that Hammond shall have " 10% of the gross output of any oil or oil products obtained from the lands covered by this option." The subject-matter of the agreement is not lands or oil concessions in Bolivia; it is an option to buy such concessions. Levering neither expressly nor impliedly undertakes to buy them. Imbrie, which parts with its entire title to the option, retains no right of purchase. *If* Levering exercises the option; *if* Levering chooses to develop the oil properties when bought, then and then only is Imbrie entitled to a percentage of the gross products. Even in the event of development, no partnership or joint venture is in contemplation. Imbrie will take a percentage of gross profits regardless of the cost of production; it will make good no deficiencies; it will be liable for no debts. There will be no common profit; there will be no common loss. All the risk will be borne by Levering; none by Imbrie. To say that there is a joint venture, where all the risk is borne by one, is to state a manifest contradiction. However, we are not concerned with a possible partnership which might have resulted had Levering exercised the option and chosen to develop and operate oil wells upon the premises. Levering, having absolute choice in the matter, did not purchase and

develop.· Therefore, such a partnership, if any were in contemplation, never came into existence. The question is, what was the relationship of the parties in respect, not to· the oil lands, but to the option for the oil lands. Certainly, Levering owed to Imbrie no positive duty in relation thereto, either to exercise it, to renew it, or to do any other thing therewith except to make a survey of the lands. Nor do we conceive that Levering owed any negative duty in respect thereto. Such being the case, the parties were not in a trust relationship towards one another.

Even if there were a trust relationship established by the agreement of December 30th, 1919, in respect to its subject-matter, the option for the oil lands, that option· terminated on August 10th, 1920, and with it the relationship was extinguished. The doctrine that neither partner, in the business and affairs of the partnership, may sell or buy for himself to the exclusion of the other, is qualified by the proviso that the transaction be initiated during the term of the partnership. " *While the relation lasts,* one partner cannot clandestinely and exclusively profit by the trust relation." (*Mitchell* v. *Reed,* 61 N. Y. 123, 136.) " The sound rule is, that he cannot make any profit to himself from a secret transaction *initiated* while the relation of trustee and *cestui que trust* exists, no matter when it springs into active operation." (Id. p. 137.) " Joint adventurers, like co-partners, owe to one another, *while the enterprise continues,* the duty of the finest loyalty." (*Meinhard* v. *Salmon,* 249 N. Y. 458, 463.) The italics in the last citation are the writer's. The original option having expired, Levering no longer was a co-adventurer of Imbrie, if ever it had been, at the time when it negotiated for a new option from Hoppe, and might, therefore, bargain exclusively for itself. It did so bargain, and on October 6th, 1920, took an option on Ayacucho and Enriqueta running to itself alone.

It may be said that Imbrie and Levering, by their

letters of October 22d, 1920, modified their agreement of December 30th, 1919, to extend the application of its terms, express and implied, to the new options of October 6th, 1920. We do not consider this to have been the fact. At the time when the letters were written, the original agreement was at an end; Levering was the exclusive owner of the new option; and the grant of an interest therein to Imbrie, attempted or promised by the Levering letter, was unsupported by a consideration. The suggestion that Imbrie furnished a consideration, in that it yielded its claim that the original option had not expired, has no force. In the first place, such a claim would have been without color of right. In the second, nothing indicates that the parties intended, Imbrie to release a valuable claim, Levering to grant a property right, the one thing to be done in exchange for the other. Whether value given constitutes a consideration " depends on whether it was in fact the exchange or at least a requested detriment induced by the promise." (Williston on Contracts, § 100.) Imbrie expresses no intent to yield its claim that the old option still continued; Levering expresses no thought that it desires such a surrender, in return for the promised interest. The whole tenor of the correspondence indicates, not that Levering was making a trade of one valuable thing for another, but that, conceiving it to be an honorable duty to let Imbrie share in the new option, it was gratuitously promising so to do.

Even were the letters expressive of a contract, the plaintiff is not helped. Levering promises " that in any development of the enterprise, whether in exercise of the option or consequent upon it, your participation as agreed upon between us shall be recognized * * *." This letter follows the precise wording of a letter from Imbrie, asking for the declaration, except that the expression " whether in exercise of the option or consequent upon the option," contained in the Imbrie letter, becomes

in the Levering letter, " whether in exercise of the option or consequent upon it." As Levering meant to make the precise declaration desired by Imbrie we must conclude that the somewhat ambiguous word " it," used by Levering, was intended to be the equivalent of the word " option," used by Imbrie. Thus considered, what is the meaning of the statement that " in any development of the enterprise, whether in exercise of the option or consequent upon the option," Imbrie's participation shall remain the same as it had been? The option referred to was the new option of October 6th, for that was the option which was the subject of the Imbrie and Levering letters and no other options were then in contemplation. The " development of the enterprise " to which the parties gave thought was a development by " exercise of the option " or by operations undertaken " consequent upon the option," *i. e.*, pursuant to an exercise of that option. As the option of October 6th, 1920, was never exercised, obviously there was never any development of the enterprise, through exercise of the option, or consequent upon the option. Consequently, Levering's letter of October 22d, even if theretofore binding, lost all force, as did the option, when on December 1st, 1920, the latter expired. At that time Levering ceased to be a co-adventurer with Imbrie, if ever it had been; ceased to be a partner; ceased to be in any fiduciary relationship. On the cessation of any such relationship, Levering was at perfect liberty to take a new option, exclusively for its own benefit, as it did on January 11th, 1921.

We have heretofore dealt with the relationship between Imbrie and Levering and the obligations which may have sprung therefrom to bind Levering. The courts below have assumed that Standard Oil and Levering were in a like situation; that each owed the same duty; that if Levering would have been bound, had it acted as did Standard, Standard equally must have been bound.

We can see no basis for the assumption. The position of Standard Oil is wholly distinct from that of Levering. There was a relationship between Levering and Imbrie which may have given rise to a duty. There was no such relationship between Standard and Imbrie.

The only connection between Standard Oil, on the one hand, and Levering and Imbrie, on the other, is found in the fact that on March 3d, 1921, when Levering possessed the options from Hoppe, dated January 11th, 1921, Standard Oil purchased Levering's interest therein. Clearly, this did not make Standard Oil a partner of Imbrie. It is true that the sale of a partnership interest by one partner does not necessarily dissolve the partnership. Nevertheless, the purchaser does not thereby become a partner; does not become entitled " to interfere in the management or administration of the partnership business; " does not gain the right to " require any information or account of partnership transactions; " becomes entitled only " to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled." (Partnership Law; Cons. Laws, ch. 39, § 53.) The restrictive obligation which the plaintiff seeks to impose upon Standard, that as a joint owner with Imbrie of the option of January 11th, 1921, it could not purchase the concessions covered by the option exclusively for itself, is one which must have had " its origin, not in a right of property, but in a contract or relation." (Per CARDOZO, J., in *Underhill* v. *Schenck*, 238 N. Y. 7, 14.) At the very most, there was here, between Imbrie and Standard Oil, only that connection afforded by the fact that each may have had " a right of property " in the same option. Otherwise, there was never any contract or relation between Imbrie and Standard Oil. They never contracted with one another; they never even negotiated. They were not partners; they were not co-adventurers; they were not trustee and *cestui que* trust. Surely persons may become partners only by the

assent of both, and here there was no assent. It is said that Standard Oil occupies the position which Levering would have occupied in a like situation, because of a concession made upon the trial by its counsel. That concession is: " We are charged with the legal obligation which Levering owed to Imbrie & Co." We take this to mean that if Levering, because of its letter of October 22d, 1920, was bound to accord to Imbrie property rights in the options of January 11th, 1921, then Standard Oil, having notice thereof, would take subject to such rights. That is undoubtedly true. However, the plaintiff is not now seeking to enforce property rights in the option of that date. It is seeking to enforce not a " legal obligation," but a trust duty arising out of a relationship. As Standard was never in any relationship whatever with Imbrie & Co., its right to purchase exclusively for its own benefit was absolute.

For all these reasons we are clear that when Standard Oil, on October 14th and October 21st, 1921, after the termination of the options of January 11th, 1921, made its purchases of the oil concessions Ayacucho and Enriqueta, it was entitled to develop and enjoy the oil lands conveyed, without rendering to Imbrie & Co. a percentage of its gross profits.

The judgment of the Appellate Division should be reversed and the judgment of the Trial Term affirmed, with costs in the Appellate Division and in this court.

POUND, Ch. J., CRANE, LEHMAN, O'BRIEN, HUBBS and CROUCH, JJ., concur.

Judgment accordingly.