**UNITED STATES of America**

v.

**Frederic H. BROOKS, Defendant.**

**No. 69 Crim. 643.**

United States District Court,
S. D. New York.

May 10, 1972.

Whitney North Seymour, Jr., U. S. Atty. by Gary P. Naftalis, John Sabetta, Asst. U. S. Attys., for plaintiff.

Thomas A. Bolan, Saxe, Bacon & Bolan, New York City, for defendant.

BRIEANT, District Judge.

Defendant was brought to trial on February 22, 1972 before the Court and jury, pursuant to an indictment filed August 28, 1969. After five days of trial and after the jury had three times confirmed to the Court that it was hopelessly deadlocked and unable to agree upon a verdict, the Court declared a mistrial and discharged the jury.

Defendant now moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal as to counts 3, 4 and 5 of the indictment. Count 1 was dismissed during the trial, with consent of the Government, and the Court directed a judgment of acquittal as to that count, and count 2 of the indictment before the case was submitted to the jury. Defendant's trial motions, at the close of the case, to dismiss the other counts were denied.[1]

Argument has been had on this motion, answering and reply affidavits have been filed and considered, and the Court has reviewed the record and exhibits.

To determine the motion, the Court must search the record, and find whether " . . . there is sufficient evidence from which it *could* be found that the essential elements of the charges . . . have been proven", United States v. Cascade Linen Supply Corp., 160 F.Supp. 565, 568 (S.D.N.Y., 1958). As stated in Neaderland v. Comm. of Internal Revenue, 424 F.2d 639 (2d Cir.), cert. den. 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970):

"The rule which the trial judge was required to apply in this Circuit in deciding the motion was that a criminal case must be submitted to the jury unless the prosecution has failed to present 'substantial evidence' to support a guilty verdict."

Obviously, the standard remains unchanged where, as here, the motion is made after all of the proof has been taken and after the matter has been submitted to a jury, and a mistrial resulted because of jury deadlock. While it is said that "in most jurisdictions it is likely that the motion was granted because the judge was convinced that no reasonable man could find the defendant guilty beyond a reasonable doubt," Neaderland v. C. I. R., *supra*, the rule in this Circuit remains more restrictive. Numerous cases applying the Second Circuit rule have been denied certiorari by the Supreme Court. See, for example, United States v. Masiello, 235 F.2d 279 (2d Cir.), cert. den. Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956); United States v. Gonzales Castro, 228 F.2d 807 (2d Cir.), cert. den. 351 U.S. 940, 76 S.Ct. 838, 100 L.Ed. 1477 (1955); United States v. Feinberg, 140 F.2d 592 (2d Cir.), cert. den. 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944). As stated in United States v. Wapnick, 202 F.Supp. 712 (D.C., 1962):

" * * * 'the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases'. No distinction is made be-

---

1. Neither reason, nor the express terms of Rule 29(c) require that disposition of the post-trial motion, after a full review of the record, must be consistent with the decision on a prior motion made under Rule 29(a). The policy reasons for allowing the jury the first opportunity to speak are well known. See Moore, Federal Practice, Vol. 8, § 29.05.

tween evidence which would satisfy reasonable men, and evidence which would satisfy reasonable men beyond a reasonable doubt. * * * '[T]he test for the judge to apply in determining what rational inferences of fact a jury may be permitted to draw from the testimony is the same in civil and criminal cases * * *.' But in determining the existence of 'substantial evidence' the Court must construe the evidence most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)." (Footnotes Omitted.)

█ Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consolidated Edison Co. of N. Y. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

A higher threshold of proof seems to be implied from a literal reading of Rule 29 of the Criminal Rules, which requires the Court to grant the motion for judgment of acquittal "if the evidence is insufficient to sustain a conviction." In Mortensen v. United States, 322 U.S. 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331 (1944), cited with approval in American Tobacco Co. v. United States, 328 U.S. 781 (1946), fn. 4, p. 787, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575 it is stated that:

"The verdict in a criminal case is sustained only when there is 'relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt,' that the accused is guilty."

The *Mortensen* rule was followed in United States v. Lefkowitz, in this Circuit, 284 F.2d 310, 315 (1960), in which the Court said:

"the question is whether, taking all the evidence, this was 'substantial enough to establish a case from which the jury may infer guilt *beyond a reasonable doubt.*'" (Italics Added.)

Also, in a footnote to the opinion in United States v. Glasser, 443 F.2d 994 (2d Cir., 1971, Lumbard, J.) it is stated that "the standard (followed in *American Tobacco* and *Lefkowitz,* supra] is the correct one." To the same effect is United States v. Melillo, 275 F.Supp. 314 (E.D.N.Y., 1967) in which Judge Weinstein reviews the authorities and suggests (p. 317) that the "single test approach" which "has long been the established doctrine in the Second Circuit" is precluded by the provisions of Rule 29. However, that rule originally stated in United States v. Feinberg, 140 F.2d 592, 594 (2d Cir. 1944, per L. Hand, J.)* may still have vitality, and, because the government cannot appeal if a judgment of acquittal is granted, it seems the single test approach should be followed with respect to this application.

██ Issues of credibility are jury questions not reached on this motion, unless testimony is so in conflict or improbable as to be incredible as a matter of law. The Court must view the evidence in the light most favorable to the Government.

The indictment comprises 11 pages with 13 numbered paragraphs. Apparently, it was drafted with extreme care, and is replete with words of art, the meaning of which is well known to lawyers, such as "agreement" and "consideration."

The indictment contains seven paragraphs of preamble. Summarized briefly, the preamble indicates that between May 15, 1968 and August 28, 1969, the date of filing of the indictment, defendant Brooks was a Vice President and registered representative of First Hanover Corporation, a Member Firm of the American Stock Exchange. From about July 12, 1968, to on or about October 30, 1968, he was a principal member of "The Stockholders' Committee for New Management of Defiance Industries, Inc." It is charged that he unlawfully, wilfully and knowingly devised and, in-

* On July 6, 1972, The Second Circuit Court of Appeals specifically overruled *Feinberg,* in United States v. Taylor, 464 F.2d 240 (2d Cir. 1972).

tended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, in violation of 15 U.S.C. § 78j(b) and 78ff, and 17 CFR § 240.10b5. In connection with the scheme, he is charged (Count 3) with making false and fraudulent representations and by trick, scheme and device, falsifying, concealing and covering up material facts during testimony concededly given before certain staff members of the Securities and Exchange Commission on July 15, 1968. The facts of a material nature, alleged to have been concealed, are that defendant, Lerner and Gardner had each bought one-third of approximately 60,000 shares of Defiance Industries, Inc., Class B Common Stock from "a certain person" [2] at $9.00 per share on the American Stock Exchange, whereas in truth and in fact, as defendant then and there well knew, "he had arranged with the aforesaid Buyers and Seller for the payment by Buyers to him in behalf of the aforesaid Seller, and for the payment by himself to said Seller of *material amounts of additional consideration,* in exchange for, and in connection with the purchase of the stock. (Italics Added). By a Bill of Particulars, dated June 23, 1971, this additional consideration said to have been arranged is specified as $45,000.00.

Count 4, arising out of the same state of facts, charges defendant with having filed with the Securities and Exchange Commission and with the American Stock Exchange, proxy solicitation materials and Schedules 14–b in connection with a proposed proxy solicitation contest to be conducted with respect to Defiance, which documents contained false and misleading statements of material facts, failed to include required information, and omitted to state material facts necessary in order to make the statements therein not false and misleading.

The false and misleading material is said to have been statements "to the ef-fect that Frederic H. Brooks and the aforesaid Buyers had paid $9.00 per share * * * but failed to disclose, describe and otherwise provide details concerning the contracts, arrangements and agreements * * * for the payment of material consideration beyond the disclosed price of $9.00 per share for the aforesaid shares of Defiance stock, and whereby said Buyers did in fact pay to Frederic H. Brooks additional consideration in behalf of the Seller for said stock." Count 4 alleges use of the United States mails.

Count 5 of the indictment, also arising out of the same state of facts, charges defendant "directly and indirectly, unlawfully, wilfully and knowingly did use the mails and means and instrumentalities of interstate commerce and did use and employ, in connection with the purchase and sale" of Defiance stock a "manipulative and deceptive device and contrivance in contravention of 17 CFR § 250.10b–5" in that he did "make untrue statements of material facts and omit to state material facts necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, and did engage in acts, practices and a course of business which would and did operate as a fraud and deceit upon certain persons, agencies and organizations." (15 U.S.C. § 78j(b) and 78ff; 18 U.S.C. § 2.)

Count 5 charges that the same allegedly untrue statements of material facts, and omissions to state material facts would, by reason of the false statement, filings and omissions to disclose, operate as a fraud and "deceipt" (sic) upon, among others, the Securities and Exchange Commission, the American Stock Exchange and its officials and membership, shareholders of Defiance, and particularly, such shareholders who had as of June 5, 1968, at 1:00 P.M., E.S.T. (sic), outstanding orders with brokers and others to sell Defiance stock at prices between $9⅛ and $10.00 per share, and upon persons interested in re-

2. Indictment, paragraph 2.

placing the management of Defiance Industries.

Pursuant to defendant's motion made December 9, 1969, the Government amplified the indictment by a Bill of Particulars. That Bill, filed June 22, 1971, contained the following particularizations, among others:

"5. 'The manipulative and deceptive device and contrivance' is a concealment from the SEC, American Stock Exchange, shareholders of Defiance stock and persons interested in replacing the management of Defiance Industries of the *agreement to pay* undisclosed consideration and the payment of that consideration to the seller of the approximately 60,000 shares of Defiance stock by the defendant and the other two buyers."

\* \* \* \* \* \*

7. The additional undisclosed *consideration* is $45,000.00." (Italics Added.)

■ The counts must be interpreted according to basic principles of contract law. An essential element of each crime is the existence of an "agreement" to pay additional undisclosed "consideration" in the amount of $45,000.00 to the Seller by the defendant and the two other Buyers over and above the $9.00 per share price.

This is the only element of the crimes with which we need be concerned on this motion, for the Government proved beyond a reasonable doubt that the testimony before SEC Staff members referred to in count 3 was given by defendant; that the schedules 14-b referred to in count 4 were filed by the defendant or persons acting at his behest with the SEC and the American Stock Exchange. While it is not free from doubt, the Court assumes that the use of the mails may be deemed proved on the record.

■ Insofar as concerns count 5, if there was an agreement to pay additional undisclosed consideration of $45,000.00 in cash to Seller on the part of defendant and the other two Buyers, and this information was withheld as a fraud and

deceit upon the persons, agencies and organizations referred to in the indictment, then there would clearly be a violation of 17 CFR § 240.10b–5, and the Government proved on the trial beyond a reasonable doubt that such misrepresentation and concealment related to a material fact.

This leaves, however, one essential or threshold element in the case, and that is the question of whether the Government proved the "agreement to pay undisclosed consideration, and the payment of that consideration to the Seller" in the amount of $45,000.00 (see paragraphs 5 and 7, Bill of Particulars, *supra,* and Indictment, paragraphs 4 and 5).

The word "agreement" in the indictment is used in the context of a bilateral agreement to sell and buy personalty. It imports the existence of a "contract" and "connotes a mutual obligation." Moran v. Standard Oil Co., 211 N.Y. 187, 197, 105 N.E. 217 (1914, Cardozo, J.). Any fair reading of the Indictment and the Bill will show that it alleges that Seller, on the one hand, agreed or contracted ·with Buyers, on the other hand, that undisclosed additional consideration in the amount of $45,000.00 would be paid; and it was paid.

Besides the necessity to have evidence of an "agreement," which the indictment, charges, the "agreement" must be to make a payment as "consideration." We are told that "Nothing is consideration . . . that is not regarded as such by both parties." (Cardozo, J., in McGovern v. City of New York, 234 N. Y. 377, 388, 138 N.E. 26 (1923), citing Philpot v. Gruninger, 14 Wall. 570, 577, 20 L.Ed. 743 (1871).)

Defendant was a registered representative and officer, but not a shareholder, in First Hanover Corporation. First Hanover was a Member Firm of the American Stock Exchange. The witness Gardner was Senior Vice President and a shareholder, and the witness Lerner was President and controlling shareholder.

Defiance was publicly traded and had its Class B shares listed on the American Stock Exchange. Brooks, a close friend

of Seller, had previously arranged for the sale through First Hanover, of shares Seller had held in another business.

Brooks, in the course of his duties, recommended to Gardner and Lerner that Defiance was "an interesting possibility for a takeover situation." He pointed out that management owned very little stock and was currently under investigation for various frauds, that there was substantial litigation pending against management, and that because of the substantial ownership in many different operating companies, including several banks, it was, in Brooks' opinion at least, a totally undervalued situation in which profits had been skimmed. Brooks recommended that Seller's 63,000 shares, which Seller wanted to sell because of financial pressure, would be a good starting point in a takeover plan, and advised Gardner that the stock was available. Seller had previously asked Brooks to find a buyer for the stock, but there was no evidence that Brooks had been given authority for Seller as to price or terms.

Gardner approved the suggestion and recommended it be discussed with Lerner. Lerner was clearly the top echelon of command in Hanover. Gardner conferred with Lerner and thereafter Brooks, Gardner and Lerner spoke about it. Lerner disapproved the project, which was favored by Gardner and strongly favored by Brooks.

On May 15, 1968, the so-called Mansfield decision, Norte & Co. v. Huffines, et als., D.C., 304 F.Supp. 1096, see also D.C., 288 F.Supp. 855 aff'd in part, remanded in part, 2 Cir. 416 F.2d 1189, cert. den., Muscat v. Norte & Co., 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1969), was filed in this Court by Judge Mansfield, now of the Second Circuit Court of Appeals. Damages in the total amount of $3,199,297 plus interest and attorney's fees were assessed variously against Huffines, Muscat and Krock, principals of Defiance. The decision imposing these damages contained findings of fact tending to disparage Muscat's character. The Mansfield decision impelled Lerner to reexamine the proposal. Lerner's viewpoint had changed because he believed, in view of the Mansfield judgment, that Muscat would be unable to put up a fight to save Defiance.

Gardner and Lerner decided to go for control and, according to Gardner, "We commissioned Mr. Brooks," (p. 63). Brooks later reported to his superiors that the 63,000 share block of stock was available at $10.00 per share, on terms. The terms were $7.00 to be paid in cash and $3.00 to be paid in "paper," by which was intended a short term promissory note. Lerner and Gardner ascertained that the securities were being held as collateral by one or more banks against loans and that a closing [3] would have to be arranged to satisfy these loans "so that we could get possession of the shares." (p. 64)

It was decided that the three individuals, Lerner, Gardner and Brooks, would purchase the stock, and that the transaction would be closed at the offices of Chemical Bank New York Trust Company at 265 Broadway in New York City, on June 5, 1968. At this time, one or more representatives of the banks which held the stock as security, would meet with Buyers and be paid off. The cash proceeds of $7.00 per share were to be delivered to the banks at the closing, to be applied to Seller's loan accounts.

Seller was not a member of any stock exchange and at least as far as the record before me appears, could sell his stock in any manner in which he wished. Purchasers, on the other hand, under rules of the American Stock Exchange, unless they received prior permission from the Exchange Governors, would, as "allied members" be required to cross the sale on the floor of the American Stock Exchange. They wanted the sale "off the floor" for several reasons, which included a desire to avoid publicity so that they could buy additional shares at reasonable

---

3. Immediate delivery from escrow against payment, was necessitated, as opposed to "regular way," or five day terms then applicable on the American Stock Exchange.

prices, and also because they would have to clear up the open offers on the specialist's book, at prices up to $10.00 before they could cross this sale on the floor.

At the closing, they met with Seller's attorney, and "a couple of gentlemen from various banks" who had brought stock certificates to the closing. Told in Mr. Gardner's words, the following occurred, p. 66:

> "When we arrived, they realized that we had not gotten permission from the American Stock Exchange. I think I was supposed to have gotten it the day before, and I forgot."

Gardner and later Lerner, attempted by telephone to get permission to cross the sale off the floor. They were unsuccessful. For the reason that, had they crossed the block at $10.00 per share, they would have had to satisfy a large number of orders all the way up to $10.00 a share, they concluded to "do the cross at $9.00 a share. They asked Mr. Brooks to contact Seller and "see if he would go along with that." [4]

Defendant phoned Seller from the Chemical Bank, in the presence of Lerner and Gardner. They spoke on the phone for a few minutes, but no version of that telephone conversation is in the record. Then, as recounted by Gardner, Brooks turned the phone over to Mr. Lerner, who spoke on the phone for "several minutes." Gardner then testified as follows (p. 67):

> "And then the phone call was concluded, and I was told that they were going to cross the block of stock of 63,000 shares of stock at $9.00 a share and that we would take care of (Seller) for the difference in some other manner, at some other time."

Q That is the difference between the $9.00 and the $10.00?

A Yes.

Thereafter, the stock transaction was closed and payment made to the bank representatives at the rate of $9.00 per share. Purchasers returned to their offices, and crossed the block of 63,000 shares on the floor of the Exchange at $9.00, and it was so reported across the tape. Purchasers Lerner, Gardner and Brooks each took one-third of the block, and Lerner later transferred 10,000 shares, or approximately one-half of his third to the witness Halpern.

First Hanover received brokerage commissions on this transaction, and the registered representative's share of this business was credited to Brooks.

*Several months* after the June 5th date, according to Gardner, a discussion was held between Lerner, Gardner and Brooks. Lerner indicated he didn't want to have anything to do with the Seller, and that he didn't want to take care of it in any other way, such as new issues or legal fees, and he thought the best way would be cash. Brooks stated (p. 79) that "$1.00 a share in cash will take care of the obligation" ($63,000.00). Lerner said he thought they should get a discount for the capital gains taxes that would not have to be paid on a cash transaction.[5] "And I think he came back at *a later time,* and told the two of us that it was agreeable and we could get the obligation for $.75 a share in cash" ($45,000.00). (Italics Added.) Gardner paid his share of the $45,000.00 ($15,-000.00) by placing cash on defendant's desk while he was in the room.

Lerner also testified for the Government. He referred to Brooks' function in dealing with the Seller as that of an "intermediary" in speaking to Seller and negotiating the purchase price.

Lerner's testimony of the events of June 5th is parallel to that of Gardner, p. 423:

> Q Did you have any conversation, you, Mr. Gardner and Mr. Brooks,

---

4. How the sale crossed the tape was not, in itself, of any concern to Seller, who was not an Exchange member. The price was of concern to him.

5. Such taxes would be an obligation of the Seller, but apparently the Purchasers thought he could evade taxes because the payment was being made in cash rather than by check.

after Mr. Gardner spoke to the man from the American Stock Exchange?

A  Yes.  Apparently the American Stock Exchange was not going to allow this to take place off the board. . . . The price of the market was lower than $10.00 and therefore we had to make arrangements and Mr. Brooks had to call (Seller) to inform him that the price was going to be $9.00 and not $10.00

Q  And what happened next?

A  Mr. Brooks called (Seller) and explained the situation to him, I think—I was not that close to the phone to hear the exact dialogue— and then he put me on the phone to confirm the fact that (Seller) understood that he was going to sell 63,000 shares at $9.00, and I got on the phone and repeated that, in effect, that we were buying 63,000 shares at $9.00, and he said 'That is right.' and then I handed the phone back to Mr. Brooks and that is the only time I ever talked to (Seller)."

Immediately thereafter, Brooks, Gardner and Lerner had a further conversation (p. 424), Lerner describes this as follows:

"As we walked away, or as I walked away from the phone, as we got back into another area, Fred (Brooks) said 'You know we had a commitment at $10.00 and because of these technical difficulties this should not interfere with the real commitment we have, and it would be *unfair* if it did, so that this has to be made up to (Seller) in some other way, and *we are going to have to figure out a way; we will have to think about it.*' And I acquiesced, I said I know we made a commitment at $10.00 and unfortunately it was *going* to be

done at $9.00 and I agreed, so did Mr. Gardner, that *we would have to figure out another way."* (Italics Added.)

Lerner testified (p. 425):

"There may have been some conversation as to alternatives, and things of that type, but I don't really recall anything of any particular significance *at the end of that day."* (Italics Added.)

Lerner testified that some days, or a very short time after the closing [6] he, Gardner and Brooks discussed "how we were going, in effect, to meet the commitment that we thought we had of $10.00 (p. 452) and Mr. Brooks had a proposal which consisted of, in effect, making up the difference by taking away the capital gains tax that would be necessarily paid, and then paying the balance in currency, in cash."

Halpern testified that while he was in Beekman Downtown Hospital sometime between May 28th and June 5th (on which date he was transferred to Mt. Sinai Hospital), Lerner had visited him and told him he was concluding the sale and that he would need $1.00 per share in cash.  Halpern testified (p. 628) that "he (Lerner) said he needed the cash forthwith, so I told him to come back the following day, and the cash would be available."  At that time Halpern says he gave Lerner $7,000.00 (not $10,000.00) as Halpern's share, and a cash loan of $5,-000.00, as against $8,000.00, requested by Lerner.  The cash had been brought to Halpern by his sister.  He swore that his sister came with the cash to the Beekman Downtown Hospital, which Halpern left on June 5, 1968.

Halpern testified explicitly that the cash which he delivered to Lerner, which Lerner said he wanted for Seller, was delivered to him prior to June 5, 1968 (p. 632).

■  Halpern quotes Lerner as telling him [7] at Beekman Downtown Hospital on

6.  "Several months" later, according to Gardner, is when this conversation took place.  See p. 18, *supra.*

7.  This conversation, in the absence of defendant, was offered as evidence of the truth thereof, on the theory that Lerner and defendant were engaged in an illegal joint venture, and the admissions of Lerner, to Halpern, are therefore admissible against Brooks.  United States v. Annunziato, 293 F.2d 373 (2d Cir.), cert. den. 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed. 2d 134 (1961).

or before June 5th, that he needed the cash to pay an extra point to Seller. At all times until the afternoon of June 5th, on the Government's theory of the case, when Gardner failed in getting permission to cross the sale off the floor of the American Stock Exchange, the transaction was $7.00 cash and $3.00 credit. On June 5th, no cash was required. The Government concedes (p. 439) that prior thereto, the alleged joint venture had not become illegal.

Halpern had good reason to know the date of June 5th, because that was the date at which he left Beekman. Halpern, a member of the Bar, had no reason to falsify the time and place of the conversation. Lerner's Grand Jury testimony placed the conversation at Beekman. At the trial, he modified his position slightly: "So I thought the *likelihood* is that it *probably* was in another hospital, the Mt. Sinai Hospital" (p. 503).

According to Lerner, it was several days after June 5, 1968, (and several months according to Gardner) when the parties decided to give extra cash in a specific amount to Seller.

Halpern's testimony, with the irreconcilable conflict as to time, does not rise to the level of substantial evidence of guilt.

Seller, not referred to by name in the indictment, was a member of the Bar of New York of some years standing and prominence. The record indicates that he had owned stocks in corporations other than Defiance, had participated as an investor in listed publicly held corporations, and had been a controlling shareholder or member of a control group in more than one corporation.

Any reasonably minded juror must infer that Seller had more than a passing knowledge of the law of contracts, as related to the purchase and sale of securities, including stocks, that he was familiar with such matters as novation, waiver and estoppel.

Another inference which must be made about the Seller is that he was at all times acting in his own economic self interest, and for his own best advantage and self protection, as indeed all reasonably prudent men, and, particularly, persons of his background, experience and expertise must be presumed to act. The record tells us that he had suffered financial reverses, and was under severe financial pressure from banks or lenders.

There is no substantial evidence in the record that Seller, on June 5, 1968, exacted an agreement that Buyers would pay an additional consideration in any amount, and, specifically, no such agreement to pay $45,000.00.

Seller's June 5th telephone conversation with Lerner is totally inconsistent with any "agreement" to receive additional "consideration." It negates any such agreement. A duty was imposed in law on Seller, in the course of his conversation with Lerner, to assert his right to receive the additional dollar. Seller was dealing with Lerner at arms length, and it is inconceivable that Seller would have engaged in the conversation as testified to by Lerner and turned over all of his stock without receiving anything, not even Lerner's telephone promise, if it had been his understanding that he was to receive additional consideration.

It was only after the telephone conversation was over that there was a private discussion between the Buyers to which the Seller was not privy, to the effect that "this has to be made up to (Seller) in some other way, and we are going to have to figure out a way; we will have to think about it."

This discussion is no more than an admission of a moral obligation. Had civil litigation arisen between Seller and Purchasers over the additional dollar per share, it would clearly be assumed that Seller had made a novation in his phone conversation with Lerner, followed by a closing (full performance), and that he was estopped to demand the additional

**178**

dollar. Seller, a lawyer, must be deemed to have known this.[8]

Gardner did not hear any part of the telephone conversations, and his testimony is only to the effect that "he was told" they would "take care of (Seller) for the difference in some other manner, at some other time." He does not remember if it was Brooks who told him.

■ Mere recognition of a moral obligation, described by the witnesses as a "commitment," does not rise to the level of "consideration." As the New York Court of Appeals wrote in Hammond Oil Co. v. Standard Oil Co., 259 N.Y. 312, 323, 181 N.E. 583 (1932), "The whole tenor of the correspondence indicates, not that Levering was making a trade of one valuable thing for another, but that, conceiving it to be an honorable duty to let Imbrie share in the new option, [Levering] was gratuitously promising to do so."

It is contended, in opposition to the motion, that defendant was Seller's agent. Paragraph 6 of the Indictment charges that he purported to act in behalf of Seller, but any proof of acting in behalf of the Seller with respect to the additional payment begins with transactions long after June 5th, (several days, according to Lerner, and months, according to Gardner), when the parties allegedly discussed how they would go about taking care of Seller in some other way. Nothing in the record makes Brooks Seller's agent for the purpose of the negotiation of price on June 5, 1968.

■ This theory places Brooks, as a claimed agent, in the forbidden position of undertaking incompatible duties. As purchaser of one-third of the stock, he would have been acting for himself in a matter where his interests would conflict with his duty to his claimed principal. A purchaser or his agent cannot, at the same time, act as agent for the Seller in fixing price, even if no fraud is prac-

ticed, and no bad faith exercised. Landin v. Broadway Surface Adv. Corp., 272 N.Y. 133, 139, 5 N.E.2d 66 (1936) citing N.Y. Cent. Ins. Co. v. Nat. Pro. Ins. Co., 14 N.Y. 85 (1856). The existence of such an unlawful agency could, of course, be proved by direct evidence. It cannot be presumed, and on this record it may not be inferred circumstantially. No substantial evidence established the scope or existence of any such agency to fix the price, or to re-establish an all cash price on June 5, 1968, after the original price on terms became procedurally untenable. The evidence is to the contrary, because if Brooks had full power to fix the price, or readjust the price, there would have been no need to have turned the telephone over to Lerner to speak to Seller.

■ Later efforts of Brooks, whether based on friendship, morality or whatever, to reduce the prior commitment to a money value, and get the other two purchasers to honor it, do not rise to the level of acting as agent for the purpose of negotiating the Seller's side of the "agreement" for "consideration" referred to in the indictment, and this argument must fail.

■ Much of the trial was consumed in litigating the credibility of the Government's two principal witnesses, who, on the Government's theory, although no conspiracy is charged in the indictment, were at all relevant times, engaged jointly with defendant in the alleged illegal conduct. These two witnesses had received prosecutorial immunity for this alleged crime and other unrelated crimes of considerable gravity, including substantial income tax evasion.

Prompted undoubtedly by an understandable feeling of bitterness towards his two former colleagues, defendant subjected each of these two Government witnesses, Lerner and Gardner, to extensive cross-examination as to their credibility. This was unwarranted on

8. The novation was an agreement to sell for $9.00, all cash, substituted for a pre-existing agreement to sell for $10.00, payable $7.00 in cash, and the balance of $3.00 in "paper."

any analysis of the testimony in chief given by these witnesses, who, if they were actuated by malice or interest, or a desire to ingratiate themselves with the Government, failed miserably.

The weakness of their testimony was noted by the Government in summation (p. 875). "They are out to get Mr. Brooks, why don't they do a better job of it, be a little more specific? . . . If they are really out to bury Mr. Brooks, they could have done a much better job at it."

Their testimony, and the entire case, contains no substantial evidence to support the threshold issue, existence of an agreement to pay additional consideration. The Government conceded, (p. 709) "It is the agreement, and the concealment of the agreement that is the Government's case."

There is not, in the record, substantial evidence of such an agreement, which would support a conviction.

Accordingly, no purpose will be served by a new trial, and defendant's motion for a judgment of aquittal should be granted as to all remaining counts, and it is,

So ordered.