**UNITED STATES of America,
Plaintiff,**

v.

**Nicholas MELILLO, Defendant.
No. 64–CR–77.**

United States District Court
E. D. New York.

Nov. 1, 1967.

Joseph P. Hoey, U. S. Atty. for E. D. New York, Brooklyn, N. Y., for plaintiff, United States. Michael J. Gillen, Asst. U. S. Atty., of counsel.

Robert S. Kreindler, New York City, for defendant.

OPINION

WEINSTEIN, District Judge.

Charged with wilfully attempting to evade the payment of income taxes (26 U.S.C. § 7201), defendant was tried before a jury. After both sides rested, the Court determined that while a reasonable juror could conclude that it was more probable than not that the defendant had filed his tax returns with knowledge that they were false, such a juror would have a reasonable doubt on this issue. The question posed is whether, under such circumstances, the Court should grant a motion for judgment of acquittal.

**FACTS**

Defendant, a laborer, began a garbage and rubbish collection service in his own name in the late 1940's. His first four Brooklyn customers, referred to by him as "stops", were "donated" by a relative, one Gallo.

The new entrepreneur worked from early morning until late at night on a truck loading heavy barrels of refuse and as he drove about he kept his eyes open for new stops. His father answered telephones and helped with truck repairs. His married sister kept the books. Service was reliable. The business prospered.

Central to the success of the business was defendant's mother, a matriarch of the old school. (The defendant, a bachelor nearing fifty, lived in her one-family attached home and received a weekly allowance from her.) Shortly after World War II she became depressed. One of her sons had been killed in battle and other relatives had died. A psychiatrist suggested that she be kept occupied and the idea of a business was seized upon by the family partly because of its therapeutic value. She helped answer the business telephone from home, sent out the bills and scanned

the papers for word of new refuse-creating ventures that could be solicited by her son.

Trucks and new stops were purchased from money advanced by the mother. She used some dozen substantial bank accounts in her name, individually and as co-owner. These assets were said by her to have come from cash received from her father and other relatives.

The mother also hired an "accountant" to help with the books. He was without formal training in this country and his main vocation was as a customer's man in a brokerage office. Experts for both the government and the defense agreed that the accounting techniques used were not satisfactory. For example, tens of thousands of dollars in income each year from major customers, including Fort Totten Army Base in Brooklyn, were deposited directly in the mother's many bank accounts, by-passing the business records completely. This income was not reflected in the tax returns prepared by the accountant. Cash, claimed to have amounted to more than twenty thousand dollars each year, was used to "purchase stops". The recipients of these disbursements were not shown on the books and defendant refused on and off the witness stand to tell who any of them were.

Whether the mother followed the accountant's directions—as she testified—or he hers—as appears possible from her forceful personality—is impossible to determine. He died a natural death after the government began its tax investigation. Some of the papers relating to the business perished with him.

The crucial issue in the case was whether the defendant filed his returns with knowledge that they were false. The government conceded that defendant's name was signed to the business returns by some one else. (The mother testified that she did it.) To support the conclusion that defendant was aware that false returns were filed it relies upon the inferences naturally arising from the facts that defendant was a high school graduate, that the family was closely knit and would be likely to talk about the business's fiscal affairs, and that he is being paid $15,000 a year by an association of rubbish cartmen to take care of its members' problems with labor and others—a position which appears to require some acumen.

Defendant's evidence indicated that if there was a crime, the wrong person had been charged with it. When he needed money to buy trucks or stops, the defendant, according to the testimony of mother and son, went to her and got it without making inquiry as to source. Although the mother regularly served defendant his supper, the occasion furnished no opportunity to talk of financial matters. As she described it, during the years in question he came home tired from working on the truck, ate his supper in silence, and went to his room to sleep in preparation for the morrow's hard labor.

Both mother and son testified that he had not dealt at all with the accountant and had not seen or had any notion of the books or of the tax returns. The mother testified that only she and her daughter talked to the accountant. This testimony was partially confirmed by that of the government investigators who had to obtain details from the accountant rather than from the defendant.

Whatever uncertainty may have existed as to whether there could be a reasonable doubt about defendant's knowledge was dispelled by the government. It rigorously cross-examined the business's recently retained Certified Public Accountant—a man of conceded reputation and skill, whose direct testimony tracked that of government experts. He had been called by the defense to show the inadequacy of the books previously kept by the business in an effort to demonstrate that the deceased accountant's advice had been bad. Pressed by the Assistant United States Attorney, he testified that the prior accountant had declared that all of his dealings were with

the mother and sister. The record reads as follows:

Q You didn't ask Mr. Melillo [the defendant] during the entire indictment years, which he is being tried for right now, '57, '58, '59, if he discussed these books and records with Mr. Lo Castro [the dead accountant]? Is that your testimony?

A The only thing *Mr. Lo Castro told me was that he had all his dealings with Mrs. Melillo and Mrs. Vivian Magliano* [defendant's sister].

Q I am asking you now in the preparation of the defense of this case. Did you ask Mr. Melillo, the defendant, whether he ever discussed during the indictment years the books and records of Melillo Carting with Mr. Lo Castro?

A No, sir.

(Emphasis supplied.)

There was no motion to strike the answer as non-responsive.

The declaration of the former, now deceased, accountant was, of course, hearsay. But it had considerable probative force. There was no obvious reason for the former accountant—the hearsay declarant—to lie about the matter in dealing with his successor. The witness, a Certified Public Accountant, had no substantial reason to falsify. All his testimony was straightforward and the manner of his responses belied guile. Moreover, the witness had a clear recollection and his memory for details was good. Taken with all the other evidence in the case and with the lack of evidence of defendant's knowledge, this uncontested testimony could not help but create a reasonable doubt.

## TEST OF SUFFICIENCY OF EVIDENCE

The question of how much evidence is required to allow a criminal case to go to the jury "is not entirely free from doubt" in this circuit. United States v. Leitner, 202 F.Supp. 688, 693 (S.D. N.Y.1962), aff'd per curiam, 312 F.2d 107 (2d Cir. 1963). The uncertainty has resulted from a dispute about whether there is a greater burden of production in criminal cases than in civil cases.

The view that there is no difference has been stated by Judge Learned Hand, speaking for the Court of Appeals. The basis of his decision was the difficulty of deciding when a case fell within the range between "more probable than not" —the civil standard—and "beyond a reasonable doubt"—the criminal measure. He declared in the *Feinberg* case:

[T]he accused do not argue that the evidence would not have supported a verdict in a civil case, but they do say that it was not cogent enough to exclude all reasonable doubt of their guilt. Evidence upon an issue which merely preponderates is indeed different from evidence which excludes all doubt; * * *. It is probable, whatever they say, that in their actual judgments the added gravity of the consequences often makes them more exacting. But courts—at least federal courts—have generally declared that the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases; and that, given evidence from which a reasonable person might conclude that the charge in an indictment was proved, the court will look no further, the jury must decide, and the accused must be content with the instruction that before finding him guilty they must exclude all reasonable doubt. * * * We agree with Judge Amedon * * * who refused to distinguish between the evidence which should satisfy reasonable men, and the evidence which would satisfy reasonable men beyond a reasonable doubt. While at times it may be practicable to deal with these as separate without unreal refinements, *in the long run the line between them is too thin for day to day use.* United States v. Feinberg, 140 F.2d 592, 594, 154 A.L.R. 272 (2d Cir.), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944) (emphasis supplied).

The opposing view that a different burden of production is required in criminal cases has been advocated in this circuit most forcefully by Judge Frank. He saw no practical difficulty in requiring trial courts to apply a more stringent rule in criminal than in civil cases, noting that,

> * * * the criminal standard requires that the judge direct a verdict for the accused if the judge reasonably thinks that the evidence for conviction is such that it might persuade a reasonable jury to find that it meets the "preponderance" test but does not meet the "beyond-a-reasonable-doubt" test * * *. [T]he judge should direct a verdict for the accused, if the judge reasonably thinks that a reasonable jury could not find guilt proved beyond a reasonable doubt. * * * If jurors can differentiate the two tests, cannot judges? Federal judges in other circuits * * * have found it possible to apply the criminal test when reversing criminal convictions. * * * the Supreme Court * * * requires a judge to perform that feat when he sits in a criminal case without a jury."

United States v. Masiello, 235 F.2d 279, 286, 287, 291 (2d Cir.) (concurring opinion), cert. denied sub nom. Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956).

Most judges and commentators who have considered the matter have agreed with Judge Frank's conclusion. See, e.g., United States v. Conti, 339 F.2d 10, 13 (6th Cir. 1964); Riggs v. United States, 280 F.2d 949 (5th Cir. 1960); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947); Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1162 (1960) ("the serious nature of the criminal sanction would seem to be ample reason for insisting upon standards of proof more rigorous than those which prevail in civil cases"); McNaughton, Burden of Production of Evidence: A Function of a Burden of Persuasion, 68 Harv.L.

Rev. 1382 (1955) ("the duty of bringing forward evidence, or burden of production of evidence, is a derivative function of the burden of persuasion of the jury"). Cf. 8 Moore's Federal Practice, ¶ 29.06 ("It is * * * difficult to imagine that the Second Circuit Rule was intended to obliterate the difference between the degree of proof required in civil and criminal cases"); McCormick, Evidence, 685 (1954) (in criminal cases courts "should apply their standards more strictly in view of the gravity of the consequences").

The United States Supreme Court, while it has not discussed the point in detail, seems to have thrown its weight behind the majority position. American Tobacco Co. v. United States, 328 U.S. 781, 787 n. 4, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Mortensen v. United States, 322 U.S. 369, 374, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944). In *American Tobacco* the Court declared:

> The verdict in a criminal case is sustained only when there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt," that the accused is guilty.

Despite the strong weight of authority to the contrary, the single test approach has long been the established doctrine in the Second Circuit. See, e.g., United States v. Masiello, 235 F.2d 279 (2d Cir.), cert. denied sub nom. Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956); United States v. Gonzales Castro, 228 F.2d 807 (2d Cir.) (per curiam), cert. denied, 351 U.S. 940, 76 S.Ct. 838, 100 L.Ed. 1477 (1956); United States v. Quinn, 141 F.Supp. 622, 627 (S.D.N.Y.1956). Several recent cases in this circuit, however, have created uncertainty as to whether it is still the rule. Compare United States v. Monica, 295 F.2d 400 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962) ("[w]hether the test of sufficiency of the evidence for the jury in a criminal prosecution be properly phrased as simply that 'the evidence would have been enough in a civil action', or * * * must be 'sub-

stantial enough to establish a case from which the jury may infer guilt beyond a reasonable doubt', * * * the evidence here met it."); United States v. Lefkowitz, 284 F.2d 310, 315 (2d Cir. 1960) ("the question is whether, taking all the evidence, this was 'substantial enough to establish a case from which the jury may infer guilt beyond a reasonable doubt' "); and United States v. Leitner, 202 F.Supp. 688 (S.D.N.Y.1962), aff'd per curiam, 312 F.2d 107 (2d Cir. 1963) with United States v. Stone, 282 F.2d 547, 551 (2d Cir. 1960)(following Feinberg) and United States v. Wapnick, 202 F.Supp. 712 (E.D.N.Y.1962) (criticizing rule but following it because, "In the Second Circuit the rule appears to be well-established"), aff'd per curiam, 315 F.2d 96 (2d Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1868, 10 L.Ed.2d 1052 (1963).

Substantial experience by many courts suggests that the fears which gave rise to the Second Circuit rule—that trial judges were not capable of applying higher standards in criminal cases—have little basis. As Judge Traynor noted, dissenting in Beeler v. American Trust Co., 24 Cal.2d 1, 33, 147 P.2d 583, 600 (1944), courts have found no difficulty applying different and more subtle standards in special kinds of civil cases lying between the normal civil and the normal criminal requirement. He wrote:

> This is not an ordinary civil case * * * for * * * it was incumbent upon plaintiff to support his contention by evidence, 'clear, satisfactory and convincing; explicit, unequivocable and indisputable.' * * * In such cases it is the duty of the appellate court in reviewing the evidence to determine, not whether the trier of facts could reasonably conclude that it was more probable that the fact to be proved exists than it does not, as in the ordinary civil case where only a preponderance of the evidence is required, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists.

When it holds that the trial court's finding must be governed by the same test with relation to substantial evidence as ordinarily applies in other civil cases, the rule that the evidence must be clear and convincing becomes meaningless.

See also Susquehanna Steamship Co. Inc. v. A. O. Andersen & Co., Inc., 239 N.Y. 285, 296–297, 146 N.E. 381, 385 (1925) (Cardozo, J.).

■ Effective exercise of the power to grant a judgment of acquittal furnishes defendants with necessary protection against conviction on inadequate proof. Since penalties are more severe in criminal than in civil cases and a greater probability of accuracy in findings of fact is demanded, more stringent control by the trial judge is warranted. This need has not grown less pressing. There has been a strong recent tendency to liberalize the rules of evidence. See, e. g., Gilbert v. California, 388 U.S. 263, 272 n. 3, 87 S.Ct. 1951, 1956 n. 3 (1967) ("Recent trend" in favor of admissibility of evidence of prior identification); United States v. De Sisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L. Ed.2d 747 (1964) (prior identification of accused). Control over juries once obtained through exclusionary rules now must be maintained through more direct means.

■ Apart from authority, experience and policy, the language of the Rules of Criminal and Civil Procedure require the court to apply a higher standard in criminal than in civil cases. On the one hand, the motion for a directed verdict, pursuant to Rule 50 of the Civil Rules, or for an involuntary dismissal under Rule 41(b) of the Civil Rules must be granted in the run-of-the-mill civil case if a reasonable juror cannot find it more probable than not that the proponent has established his case. On the other hand, Rule 29 of the Criminal Rules requires the court to grant a motion for judgment of acquittal "if the evidence is insufficient to sustain

a conviction". It is insufficient, the Supreme Court has told us in *American Tobacco,* if a reasonable juror would have to entertain a reasonable doubt about defendant's guilt. Thus, even if the courts wished to use the same standards in civil and criminal cases, the rules preclude them from doing so.

The problem of jury control at the trial level is particularly important in a case like the present one where prejudice lurks. The trial judge, observing the jury, sensed a distinct danger that it would rely upon rumor current in the local press to conclude that defendant was linked with organized crime and weigh this conclusion against him in determining guilt. See Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S. Ct. 1511,.91 L.Ed. 1850 (1947) ("The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy"). The defendant was closely associated—as owner of his own business and as a trade association official—with the garbage collecting industry, believed to be influenced by criminals; he received assistance from a cousin named Gallo—a name associated in the public's mind with organized crime; and there were large payments for "purchasing stops" to unnamed persons—who might have been used to channel cash into the underworld. Were the evidence sufficient to allow an unprejudiced juror to find the defendant guilty, these factors would not entitle defendant to a judgment of acquittal. Their existence, however, makes particularly important a careful analysis and weighing by the trial judge of the evidence. The fact that the jury in this case was of comparatively superior quailty—it consisted of members who had served repeatedly and who included among their current occupations an aircraft instrument engineer, field auditor, internal auditor, supervisor of I.B.M. operations, computer supervisor, plant supervisor, and bookkeeper (and one was the father of an FBI agent)—does not

affect the court's obligation in this respect.

■ Despite the strong compulsion on trial judges to dismiss in a case like this one, it has been suggested that they should be reluctant to grant a motion of acquittal since the government cannot appeal the decision. See, e. g., Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962) (per curiam) (motion of acquittal granted in long and complex case after government had only called three witnesses; double jeopardy bars second prosecution). If the motion is denied, the argument goes, the defendant would have a right of appeal and thus would be fully protected. See Newman v. State, 148 Tex.Cr.R. 645, 651–652, 187 S.W.2d 559, 562–563, cert. denied, 326 U. S. 776, 66 S.Ct. 174, 90 L.Ed. 466 (1945) ("the position this Court occupies in relation to such cases is both unique and difficult * * *. If we reach a conclusion that the confession was involuntary, such conclusion is binding upon the State and society, for under our Constitution * * * the State is expressly denied the right of appeal in a criminal case and is therefore barred from seeking a review of that conclusion by the Supreme Court. On the other hand, if we conclude that the confession was voluntary, such conclusion is in no sense final, binding the accused only until reviewed by the Supreme Court of the United States."). Such an attitude encourages the trial judge to abdicate his responsibility. It must be rejected. See Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947) ("It is the function of the judge to deny the jury any opportunity to operate beyond its province. * * * If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal because no other result is permissible within the fixed bounds of jury consideration."); cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1962) (trial judge must first determine that confession is voluntary before allowing jury

to consider it). The trial judge, having just heard the case and observed the witnesses and the jury, is in a better position than an appellate court to rule on a motion for acquittal. For example, the relationship that existed here between a middle-aged son and his family, although plausible in the flesh, would seem bizarre from the printed record.

## CONCLUSION

The rule laid down in the *Feinberg* case appears to have lost its vitality. The motion for judgment of acquittal is granted.

So ordered.