**UNITED STATES of America,**

**Plaintiff,**

**v.**

**Lawrence A. SHAFER et al., Defendants.**

**No. CR 74–165.**

United States District Court, N. D. Ohio, E. D.

March 29, 1974.

Robert Murphy, Paul Lawrence, John Hoyle, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Bernard Stuplinski, C. D. Lambros, Cleveland, Ohio, E. K. Wright, Dover, Ohio, Jack Schulman, Michael Diamant, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Defendants have moved this Court for a judgment of acquittal, pursuant to the provisions of Federal Rule of Criminal Procedure 29(a). For the reasons dis-

cussed below, the motion is granted as to each of the eight defendants.

## I. STANDARD FOR DECIDING RULE 29(a) MOTIONS.

Rule 29(a) states that, "The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

Such a motion "furnishes defendants with necessary protection against conviction on inadequate proof". United States v. Melillo, 275 F.Supp. 314, 318 (E.D.N.Y.1967). When made, as here, at the close of the government's case, a Rule 29(a) motion for acquittal implements "the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense." Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893, 895 (1963). When, as in the instant case, the evidence submitted by the government is "insufficient to sustain a conviction," the court is required by Rule 29(a) to enter a judgment of acquittal.

██ Since the verdict in a criminal case can be sustained only when there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt," that the accused are guilty of each necessary element of the crime charged, Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944), the issue in a Rule 29(a) motion is not whether there is *any* evidence in support of the government's claims. Rather, "If the evidence is such that reasonable jurymen must necessarily have . . . a doubt, the judge must require acquittal." Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229 (1947), cert. denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). The trial judge must determine whether there is sufficient evidence before the court, from which reasonable

jurors might properly conclude guilt *beyond a reasonable doubt*.

█ This standard is applied to each and every element of the offense charged, without reference to the credibility of witnesses. Thus, a Rule 29(a) motion should be granted when it is clear, at the close of the government's case, that evidence which would justify a jury in finding any single element of the offense charged beyond a reasonable doubt is lacking.

It is clear that the evidence offered by the government is insufficient to support a finding that any of the defendants were possessed of the requisite "willfullness" required by 18 U.S.C. § 242, as discussed below, beyond a reasonable doubt. Accordingly, a judgment of acquittal by the court is necessary and appropriate.

## II. FACTUAL CONTEXT.

The evidence offered by the government establishes the following facts:

In May, 1970, Kent State University had a student enrollment of approximately twenty thousand. On Friday, May 1st, at 12:00 noon a rally was held on the campus commons to protest former President Nixon's announcement of the incursion of American Troops into Cambodia. Approximately 500 students and faculty attended this rally which was peaceful in nature and without incident. A similar rally was subsequently scheduled for noon on Monday, May 4th.

Friday night there were several disruptive incidents off-campus in the town of Kent itself. There was some vandalism but no serious personal injury. The Mayor of Kent requested the assistance of the National Guard. Elements of the 145th Infantry and 107th Armored Cavalry were alerted. Both of these units had been in an active duty status since April 29, 1970 because of an unrelated Teamster strike. Troops began entering the city of Kent in the evening of May 2, 1970.

At approximately 8:30 p. m. on May 2nd, the campus R.O.T.C. building was set afire and firemen were forcefully prevented from putting out the fire. The building was subsequently destroyed and the next few hours were marked by sporadic confrontations between students and law enforcement officers. National Guardsmen proceeded to the scene and their arrival was met by students hurling stones at the troop convoy. The next 36 hours, until the morning of May 4th, followed the established pattern of activity; the campus was quiet by day and restless at night.

On the morning of May 4th approximately 2,000 students gathered in the vicinity of the victory bell on the commons. An order to disperse went unheeded and tear gas proved ineffective in dispersing the students. The National Guardsmen then advanced on the students with fixed bayonets and loaded weapons. The students were driven up "blanket hill," past Taylor Hall, and on to the Prentice Hall parking lot and the practice football field. Elements of the Guard continued to advance and subsequently took a position on the practice football field. While there the troops were subjected to a barrage of rocks and a stream of verbal abuse. At one point, several guardsmen assumed a "kneeling" position, pointed their rifles, but did not discharge them. This tends to negate any inference that the guardsmen planned or intended to "punish" the students in the crowd, particularly since the rock throwing and verbal abuse reached a crescendo at this point in time.

Shortly thereafter the Guardsmen on the practice football field retraced their steps and began to return up the hill towards Taylor Hall. This movement was begun in a tactical formation, but, possibly, because of individual fatigue and the severity of the terrain the formation, in part, degenerated into a ragged line. Students began to fill in behind the Guard and follow them up the hill. Some rock throwing continued during this period. As the Guardsmen

reached the top of the hill, some, including defendants, turned about and fired their weapons in the direction of the students who were initially at their rear, but who now were facing them. No order to fire was given nor was there any verbal warning given to the students prior to the fusillade.

From the evidence it would appear that at least 54 shots were fired by approximately 29 Guardsmen. Probably, as indicated by the government's evidence, a single shot immediately preceded the main volley, and may have led to the later shots. The total elapsed time of the actual firing was approximately thirteen seconds. Some of the Guardsmen fired at specific students while others merely fired into or over the crowd. There appears to have been no communication among the guardsmen immediately prior to the shooting. As a result of the shooting, four students were killed and nine were wounded.

The government has presented no evidence bearing directly on the intentions of those Guardsmen, including defendants, who fired their weapons. The evidence offered by the government strongly suggests that the Guardsmen fired for any of a number of reasons, including the mistaken belief that an order to fire had been given, the fear that they were being fired upon, a desire to convince the mob to cease the barrage of rock-throwing, and general confusion.

■ Thus, while reasonable jurors might infer that the guardsmen fired for the purpose of violating the Constitutional rights of the students, the government has offered no evidence which would make that inference any more likely than several others, none of which would support a finding that the requirements of § 242 have been satisfied. In a criminal case such as this, where the jurors must find each of the elements of the offense charged beyond a reasonable doubt, the government must do more than offer several possible inferences of equal weight, for, in such a situation, the jurors cannot reasonably be free of doubt as to the correct inference to be drawn from the evidence.

There is no evidence from which the jury could conclude beyond a reasonable doubt that the defendants acted with premeditation, prior consultation with each other, or any actively formulated intention to punish or otherwise deprive any students of their constitutional rights.

## III. "WILLFULLNESS" UNDER 18 U.S.C. § 242.

■ In any prosecution under Title 18, § 242, U.S.C., several elements must be established by the government: (1) that the defendants' acts must have deprived someone of a right secured or protected by the Constitution or laws of the United States; (2) that the defendants' illegal acts must have been committed under color of law; (3) that the person deprived of his rights must have been an inhabitant of a State Territory, or District; and (4) that the defendants must have acted willfully. United States v. Senak, 477 F.2d 304, 306 (7th Cir. 1973); *see also* United States v. Jackson, 235 F.2d 925, 927 (8th Cir. 1956).

Only the last element is in genuine dispute in this case, accepting all of the evidence offered by the government as credible. The role of "willfullness" in this statute is crucial, based on the controlling interpretation articulated by the Supreme Court in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

In *Screws*, the predecessor of § 242, § 20 of Title 18, was under strong constitutional attack for "vagueness." The plurality opinion, by Mr. Justice Douglas, admitted, "The serious character of that challenge" (325 U.S. at 96, 65 S.Ct. at 1033), noting that the "general rule" of "specific intent" in criminal prosecutions would be insufficient to sustain this statute. This "general rule" rejected by the Court holds that, "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law

under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." This rule, because of the special nature of this statute, is not sufficient as a definition of "willfullness."

In its analysis of the proper construction of § 242, the Court conducted an extensive search into the historical and legislative roots of the statute. It noted the origins of the section as "an anti-discrimination measure" (at 98), later extended to prohibit the "deprivation of any rights, privileges, or immunities," guaranteed by federal law.

The "willfullness" requirement was added later, to make the section "less severe," according to the legislative history. The Court found this reduced "severity" to be expressed through a special requirement of *intent* to violate federal rights, rather than a generalized "bad purpose."

"Willfull" is not a term with a single, unchanging meaning, according to the Court (at 101). In § 242, Justice Douglas holds that, "An evil motive to accomplish that which the statute condemns" is a necessary element of the crime. This test is re-stated many times throughout the *Screws* opinion, as a "purpose to deprive a person of a specific constitutional right," or a "specific intent to do a prohibited act" (at 101, 65 S.Ct. at 1035). This is also stated to be equivalent to requiring "proof of bad faith" (at 102), which the Court regards as a narrowing construction supported by the history of the statute.

In the words of the Court, "One who does act with such specific intent is aware that what he does is precisely that which the statute forbids . . . He violates the statute not merely because he has a bad purpose but because he acts in defiance of announced rules of law" (325 U.S. at 104, 65 S.Ct. at 1037).

There is an additional reason—beyond the need to perserve the statute from attack—which the Court offers for such a narrowing construction. This inter-pretation of the statute "more nearly preserves the traditional balance between the States and the national government in law enforcement" (at 105, 65 S.Ct. at 1037), than would a construction allowing § 242 to reach acts committed with a mere "bad purpose." § 242 is *not,* therefore, construed to be a federal "catchall" statute, substituting for state criminal law, but rather is designed to protect federal rights from invasion by those clothed with the authority of state law. Such officials are guilty under § 242 "where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution" (325 U.S. at 106, 65 S.Ct. at 1038).

Normally, proof of such "willfullness" will not be difficult in a case brought under § 242, since in the typical case it can easily be inferred from the egregious circumstances surrounding the alleged acts. Typically, a § 242 defendant has pre-existing malice toward his victim, deprived him of his rights at close range with weapons designed to beat or maim, continued his assault for some time, and acted without any provocation. All of these factors, noted by the Court (325 U.S. at 107, 65 S.Ct. 1031), are held to be relevant to the determination of "willfullness" by the Court. None are present in the instant case. *See also* Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

The narrow construction of § 242 in *Screws* led the Court to reverse the conviction, due to the inadequacy of the charge. The passage of the charge found insufficient reads (325 U.S. at 94, 65 S.Ct. at 1032) as follows: ". . . . if these defendants, without its being necessary to make the arrest effectual or necessary to their own personal protection, beat this man, assaulted him or killed him while he was under arrest, then they would be acting illegally under the color of law, as stated by this statute . . . ."

In reversing, the Court said of this charge (at 107, 65 S.Ct. at 1038), "in view of our construction of the word

'willfully' the jury should have been further instructed that it was not sufficient that petitioners had a generally bad purpose. To convict it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e. g. the right to be tried by a court rather than by ordeal."

This is very much the situation here. The most reasonable inference the evidence submitted by the government can support is a finding of generalized intent to injure or frighten. There is insufficient evidence from which a jury could infer beyond a reasonable doubt any intention to deprive any of the demonstrators of their constitutional rights. Thus, the *Screws* case is strong—in fact decisive—authority for a judgment of acquittal in the instant case.

The *Screws* decision imparted a stricter construction to the last of the required elements, willfullness. This requirement of a specific intent to deprive one of a right protected by the Constitution has been uniformly followed by the federal courts. *See, e. g.,* Clark v. United States, 193 F.2d 294 (5th Cir. 1951); Koehler v. United States, 189 F.2d 711 (5th Cir. 1951); Pullen v. United States, 164 F.2d 756 (5th Cir. 1947). Because of the extensive analysis and guidance provided by the *Screws* opinion, most of the federal courts repeat its language verbatim. Those decisions offering any in-depth analysis of their own have not strayed from that central thread.

In United States v. Ramey, 336 F.2d 512 (4th Cir. 1964) the court stated:

"the statute uses the term 'willfully'. The trial court correctly instructed the jury that: 'In law the use of the words "wilful" and "willfully" generally imply a conscious purpose to do wrong. Doing a thing knowingly and willfully implies not only a knowledge of the thing done, but a determination to do it with evil purpose or motive. . . .' 'Willful,' as applied to this section of the Act, implies *not merely a conscious purpose to do wrong, but a specific intent to de-*

*prive [someone] of a right."* 336 F.2d at 515. (emphasis added)

This same construction of the statute in question was stated more forcefully in United States v. O'Dell, 462 F.2d 224 (6th Cir. 1972). There the court said:

"It is apparent from the bare statutory language that in any prosecution for violation of 18 U.S.C. § 242 a central question facing the trier of fact will be whether a right protected by the Constitution or federal laws has been plotted against or taken from a citizen or inhabitant of one of the United States."

Thus it is clear that for one to be convicted under § 242 he must be possessed of more than a mere "bad purpose":

"The implication seems to be evident in the *Screws* case that the statute did not intend to make one a criminal if 'his purpose was unrelated to the disregard of any constitutional guarantee.' . . . It must be kept in mind that every beating by a state officer no matter how willfully administered, is not a deprivation of a federal right as condemned by [§ 242]." Pullen v. United States, 164 F.2d 756 (5th Cir. 1947).

Perhaps the most concise interpretation of *Screws* and also the one most relevant to the instant case was articulated in United States v. Delerme, 457 F.2d 156 (3rd Cir. 1972). The court said:

"Thus we conclude that in a criminal prosecution under § 242, it is only where there is supportive evidence found by the fact finder of a willful intention to deprive another of his constitutional rights that the federal statute comes into play. It is one thing to be guilty of excessive force, and thus chargeable with violating the law of the state and territory; it is quite another for a policeman to administer a physical beating as punishment for allegedly breaking the law. In the latter case the police officer has acted as prosecutor, judge, and jury; he has brought the charges,

502

found the suspect guilty, and administered punishment." 457 F.2d at 161. In *Delerme* an off-duty policeman, angered by the reckless driving of an individual, pursued him in his car and assaulted him after a high speed chase. Chief Judge Seitz, in a dissenting opinion, characterized the *mens rea* necessary for a § 242 conviction:

"However, as the district court itself indicated, the testimony suggested that the defendant aroused by the relentless and circuitous automobile chase, acted 'in the passion of anger.' In my view such evidence does not permit the conclusion that the defendant possessed 'some specialized knowledge or design or some evil beyond the common-law intent to do injury.' . . . A strict evaluation of the evidence is necessary if federal prosecutions under § 242 are not to swallow up state and local criminal laws." 457 F.2d at 161.

This language seems especially relevant to the shooting incident at Kent State. If the defendants fired their weapons out of fear, anger, or frustration, then their actions may be cognizable under the State criminal code. If, and only if they fired with the specific intent to deprive the students of a right secured by the Constitution (e. g. trial by jury), may culpability be found under § 242.

█ In the instant case, the government has not offered sufficient evidence from which reasonable jurors may infer "beyond a reasonable doubt" that the defendants were possessed of any specific intent to deprive any of the students of their constitutional rights.

At best, the evidence presented by the government would support a finding that the amount of force used by defendants was excessive and unjustified; that they intended to harm or frighten at least some of the demonstrators; and that they fired without being ordered to do so.

This does not meet the stringent test first stated by the Supreme Court in

*Screws*, and since re-stated in virtually every opinion construing 18 U.S.C. § 242; that the defendants were motivated by a specific intent to deprive some students of constitutionally-protected rights.

Those cases which have found the requisite "specific intent" to support convictions under § 242 have, without exception, been characterized either by explicit testimony as to the "willfullness" of defendants' motivations (*see*, e. g. United States v. Delerme, 457 F.2d 156, 161 (3rd Cir. 1972), or by circumstances which leave no reasonable doubt as to defendants' motives.

It is one thing to infer "specific intent to deprive an individual of his rights" when a defendant has arrested his victim under a fraudulent warrant in order to "get him out of the way" on election day, and the victim was an election official, United States v. Ramey, 336 F.2d 512 (4th Cir. 1964); or when a group of deputy sheriffs and constables extort fraudulent "bail" from hapless motorists in a small town, United States v. O'Dell, 462 F.2d 224 (6th Cir. 1972); or when a Town Marshal forces a poor black man who had embarrassed him to jump into a river, where he drowned, Crews v. United States, 160 F.2d 746 (5th Cir. 1947); or when two police officers clamp a bicycle lock around a suspect's testicles to persuade him to confess to a crime, Apodaca v. United States, 188 F.2d 932 (10th Cir. 1951). It is quite another to make such an inference from the confused, momentary behavior of a group of frightened guardsmen devoid of any genuine leadership.

The conduct which § 242 is intended to reach is not spontaneous firing by frightened guardsmen upon a noisy and occasionally violent crowd, but rather the execution of a specific purpose to deprive individuals of their rights, under color of law. Despite the vastly superior firepower possessed by the guardsmen, which may seem somewhat analogous to the power of control present in many § 242 violations, the firing

by these guardsmen, by itself, does not constitute such conduct as would permit the inference of the requisite "willfullness." Such conduct virtually always requires some pre-existing course of conduct between the parties, some motive beyond fear, panic, and exhaustion in order to support a finding of specific intent to violate constitutional rights.

█ Even the specific intent to injure, or the reckless use of excessive force, without more, does not satisfy the requirements of § 242 as construed in *Screws*. There must exist an intention to "punish or to prevent the exercise of constitutionally guaranteed rights, such as the right to vote, or to obtain equal protection of the law."

The defendants in this case, without exception, did not know the identities of the individuals they fired upon. Even considering the students as a group, there is insufficient evidence from which a jury could properly conclude that defendants were possessed of any clear or specific intentions whatever toward the crowd other than fear and a desire to leave the area without injury.

It is painfully clear, in light of the evidence at this point, that sufficient proof of the requisite specific intent is lacking, and that a judgment of acquittal is therefore appropriate.

## IV. SCOPE OF DECISION.

In a case so filled with emotional issues, and involving the behavior of so many persons, it seems important to note what this opinion does, and does not hold.

This opinion holds only that, based upon the evidence offered to the court, reasonable jurors must find that there is a reasonable doubt as to whether these eight defendants were possessed of a specific intention to deprive the students of Kent State University set forth in the indictment of their constitutional and federal rights, at the time they discharged their weapons.

█ This opinion does not hold that any of the defendants, or other guardsmen, were justified in discharging their weapons on May 4, 1970 at Kent State University. "Justification" is irrelevant to a proceeding under 18 U.S.C. § 242. That section is concerned with the intentions of the defendants, and not with possible justification of their actions.

Very different considerations would obtain if this were a trial of these eight guardsmen in state court on charges, for example, of shooting with intent to injure or maim. In that situation, the issues of justification, of the possible excessiveness of the force used, of provocation, of self defense—might be relevant to the offense charged.

In particular, it must be clearly understood that the conduct both of the guardsmen who fired, and of the guard and state officials who placed these guardsmen in the situation noted above is neither approved nor vindicated by this opinion.

It is entirely possible that state officials may yet wish to pursue criminal prosecutions against various persons responsible for the events at Kent State. This opinion does not pass on the propriety of such prosecutions, if any.

The events at Kent State University were made up of a series of tragic blunders and mistakes of judgment. It is vital that state and national guard officials not regard this decision as authorizing or approving the use of force against unarmed demonstrators, whatever the occasion or the issues involved. Such use of force is, and was, deplorable.

█ The evidence in this case does not satisfy the requirements of 18 U.S.C. § 242. This statute is highly specialized, and restricted even further by court interpretation. It does not replace the functioning of the criminal codes of the states, even when state officials fail to enforce the law.

Accordingly, on the basis of the evidence presented by the government, reasonable jurors must find a reasonable doubt as to whether the eight defendants possessed the specific intention to deprive students of their constitutional

rights, as required under 18 U.S.C. § 242. Therefore, the motion is well taken, and a judgment of acquittal of all defendants is hereby granted.

It is so ordered.